# Durrett *v.* The State.

*Indictment for Grand Larceny.*

1. *Evidence; what admissible.*—No unerring or certain general rule can be laid down, governing every case, as to when collateral and extrinsic facts become relevant and material testimony, as shedding light on the motive or intent with which a criminal act was done ; and while care must be exercised not to open too wide a field for extrinsic exploration, yet collateral or outside facts, tend-

[Durrett v. The State.]

ing naturally to elucidate the act or intent charged, and pointing directly to the question in controversy, not merely furnishing material for comparison, are admissible.

2. *Same ; what not admissible.*—On the trial of an indictment for larceny of a horse, the taking of which, clandestinely in the night time, was not denied by the defendant, who did not inform the owner afterwards, the issue being only as to the *intent* of the taking, whether felonious, or under an honest belief that he had a license from the owner to use the horse in escaping from revenue officers,—evidence that the owner knew defendant had been engaged in illicit distilling, and on one occasion had found a keg of whiskey under his steps, which had been put there the night before, and "from some things which had occurred between them before, he supposed the defendant had put it there," is inadmissible, though proposed in connection with evidence showing "intimate personal and social relations between them, and that defendant had furnished whiskey to the prosecutor, which he knew had been made by defendant, in violation of the United States revenue law, before the horse disappeared, and that the prosecutor had told defendant that he might have his horse, at any time, to escape or avoid being arrested for violations of the revenue laws of the United States."

3. *Same.*—Nor is evidence admissible, that some time before the taking of the horse, the revenue officers had sought to arrest defendant while at work in a field, and fired upon him as he fled, and at other times had threatened to kill him ; or that on one occasion he had attempted to flee the country, but forbore to attempt it, for fear of being arrested on the railroad train—there being no evidence that at the time of the taking of the horse, the defendant was in such danger of arrest as to prevent his then notifying the owner of the horse, or afterwards informing him of the taking.

4. *Same.*—Where two separate and distinct conversations take place between the prisoner and the witness, proof by the State of one of the conversations, will not authorize the defendant to prove the other conversation.

5. *Reversal ; what not ground for.*—While it is not usual for courts to interfere and rule out evidence which counsel is willing to let in, yet if the evidence is irrelevant or immaterial, the court may rule it out of its own motion, and its ruling furnishes no ground for reversal.

6. *Charge ; what proper.*—In charging the jury, the court may state the testimony which witnesses have deposed to, and should, in proper cases, lay down the rules by which the jury is to be guided in weighing it ; and may explain controverted questions raised on the trial, and inform the jury on whom the burden of proof rests in each aspect of the case ; but in doing this, it should be careful not to give any undue prominence to any phase of fact which the testimony tends to establish ; leaving the jury, when there is legal evidence bearing on the question, to determine its weight, under appropriate instructions.

7. *Charge ; when not ground for reversal.*—Where a charge asked, isolates certain enumerated facts or circumstances, and invokes instructions of the court on them, as circumstances specially to be weighed in the cause, the court, if it gives the charge, should accompany it with a fair and candid statement of any facts and circumstances pointing in an opposite direction ; but the mere fact that a charge given has a tendency to mislead, is not ground for reversal ; additional explanatory charges should be asked.

8. *Charge; what properly refused.*—A charge that the defendant could not be convicted for larceny of a horse, if he had the honest belief, at the time of the taking, that he had authority from the owner of the horse to take and use him, to avoid arrest by revenue officials, is properly refused, where there is evidence of a clandestine taking by defendant in the night time, without any attempt then or afterwards to notify the owner, and no evidence that he was pursued or in danger of arrest at the time of the taking. Such a charge ignores the inquiry whether the horse was taken, under such authority, to avoid arrest, and renders the defendant guiltless if he had such belief, though the defendant did not choose to avail himself of such license, but feloniously took the horse to convert it to his own use.

APPEAL from Clay Circuit Court.

Tried before Hon. JOHN HENDERSON.

The appellant, Green Durrett, was indicted for the larceny of a horse belonging to one James Hardy.

Hardy testified that his horse disappeared from his horse lot on the night of the 16th day of July, 1877; that the fence was down at the back of the lot, and the horse had been taken out and carried off through the woods, or along a dim path; that, by printed notices, he offered a reward of one hundred and twenty-five dollars for the horse and thief, and that about eight or ten days afterwards the horse was delivered to him by T. A. Walls, at Montevallo, distant about seventy-five miles from the place where the horse disappeared.

The evidence of this witness, on cross-examination, tended to show that the defendant had, prior to the alleged larceny, been engaged in illicit distilling; that witness knew this fact and had occasionally visited the defendant, and had received whiskey from him. This witness further stated, on cross-examination, that "a short time before the alleged larceny, and early one morning, he found a keg of whiskey under the door steps of his store, which had been put there the night before, and that from some things that had occurred between the witness and defendant he supposed that the defendant had put it there. The State objected to this evidence and moved the court to exclude it. Before the State acted on this motion, counsel for defendant stated that other evidence would be offered, in connection with this answer of the witness, showing intimate social and personal relations between the witness and defendant, and that defendant furnished whiskey to witness, which he knew had been made by the defendant in violation of the laws of the United States, before his horse had disappeared, and that the witness had told the defendant that he might take his horse at any time, to escape or avoid being arrested for a violation of the revenue laws of the United States." The court then excluded the evidence concerning the keg of whiskey, and the defendant excepted.

T. A. Walls was then examined as a witness for the State, and testified that, in July, 1877, he saw a printed notice signed by Hardy, stating that a horse had been stolen from him, and offering a reward for the recovery of the horse and the capture of the thief, and that in company with one Short-ridge he arrested the defendant, on the 22d of July, 1877, near Montevallo, while he was riding the horse which was afterwards delivered to Hardy. "At the time of the arrest the defendant stated that the horse was his, and that he had owned him a year or two. This witness further testified

that the arrest was made about a mile from Montevallo, and that when they started off, Shortridge and the defendant rode ahead of witness some distance, so far that witness could not hear what passed between them; that when they had gone about a half mile defendant and Shortridge stopped and witness came up to them; this was about a half hour after the statement by the defendant that the horse was his. Defendant's counsel then asked the witness if the defendant did not then state that the horse belonged to Hardy, who had given his consent for the defendant to take him and get out of the way of the United States revenue officers." The State objected to this question, the court sustained the objection, and the defendant excepted.

One Humphries, a witness for the defendant, was then asked, " whether or not the defendant had carried whiskey to Hardy's store, or let him have whiskey at any other place." Witness replied, that on one occasion he knew of defendant's leaving a keg of whiskey under the door steps of Hardy's store. The State objected to this evidence, the objection was sustained, and the defendant excepted. This witness further testified that on one occasion, in February, 1877, he had heard Hardy say, at the house of the defendant and in the presence of several others (naming them), "that if he was riding along the road and a friend of his was likely to be arrested for illicit distilling, that he would get down off his horse, and let the friend have him to get off on, and that a friend desiring to get away from the United States revenue officers was welcome to any thing he had to aid his escape."

Defendant then offered to prove, by one John Caldwell, that, a short time before the alleged taking of the horse, witness and defendant were working in a field near defendant's house, when one Dallas Smith, a revenue officer, and an armed posse, passed in the public road near by; that when defendant saw them he said they were after him, but that they would not catch him, and at the same time ran towards the woods; that Smith and his posse commenced shooting at defendant, and shot at him until he reached the woods and was out of sight. The State objected to this evidence; and before the court passed on this objection, counsel stated that the evidence was offered in connection with other evidence, showing that the revenue officers of the United States, about the time above stated, had threatened to kill the defendant; that these threats were communicated to him; that he became greatly alarmed and laid out in the woods; and that during that time he had made an unsuccessful attempt to leave the country by railroad. The court then sustained the objection, and defendant excepted. The

defendant then proposed to show, by one Ligon, that Smith and his posse had threatened to kill defendant, and that witness had communicated these threats to the defendant, just before the alleged stealing of Hardy's horse. The court sustained an objection by the State to this testimony, and the defendant excepted. The defendant then offered to prove, by the same witness, that when the threats above mentioned were communicated to the defendant he ceased to stay at home and laid out in the woods, saying that he was afraid of being killed by the persons who had threatened him. The court sustained an objection to this evidence, and the defendant reserved an exception.

It was admitted by the State that two absent witnesses (Humphries and Striplin) for the defendant, would, if present, testify that "about ten days before the arrest of defendant he went to Oxford, in Calhoun county, Alabama, and on his arrival there informed Humphries that he was going off, to avoid being arrested for illicit distilling; that the government officers were pursuing him and he had gone to Oxford to go off on the railroad; that Humphries then informed the defendant that a man by the name of Frank was then in Oxford, and that if defendant took the train, Frank would notify the government officials by telegraph that defendant was on the train, and if he went up or down the railroad he would be arrested; that defendant left Oxford, and when about leaving told Humphries he would return home." The State objected to the introduction of this evidence, and pending the argument on its admissibility the prosecuting counsel announced that he would withdraw all objection to it. The court then announced that it would, of its own motion, exclude this testimony, and did so exclude it, and the defendant excepted.

Counsel for the defendant having, in their argument to the jury, alluded to, and commented on the evidence of said Humphries, the counsel who made the closing argument for the State also alluded to and commented on such testimony. The court did not interrupt either of the counsel when allusion was made to the testimony of said Humphries. In the charge to the jury, in stating the evidence, the court "referred to the evidence of said Humphries, calling his name as a witness as being before the jury." The defendant excepted to the action of the court in permitting counsel for the prosecution to refer to and comment upon the evidence of said Humphries; and also, separately, to the action of the court in referring to the evidence of said Humphries. After these exceptions were taken, the court stated that the exclusion of the testimony of said Humphries had escaped the mind of

[Durrett v. The State.]

the court, and said to the jury that they should not regard
the argument of counsel or the charge of the court as to the
evidence of the said Humphries.

The court then charged the jury of its own motion, "That
it made no difference how often Mr. Hardy told the defend-
ant to take the horse to escape from revenue officers; if Dur-
rett took the horse with a felonious intent to convert the
horse to his own use, and it was in Clay county, and before
the finding of the indictment, he is guilty." To this charge
the defendant also excepted. The court, of its own motion,
further charged the jury, "That human nature is frail, and
the law allows you to look to the interest and feelings that
each witness may have in the event of this prosecution. It
is said by the State that the witness Humphries is the brother-
in-law of the defendant, and it is said by the counsel for the
defendant that Mr. Hardy may be prosecuted, in his turn,
for instigating a malicious prosecution. Mr. Hardy is not
marked on the indictment as prosecutor, and there is no
evidence that he is such." To this charge the defendant
excepted. The court also charged the jury as follows: "It
is insisted by the defendant that he took the horse to escape
from the revenue officers. If you believe, from the evidence,
that previous to the time of taking the horse the defendant
was in Oxford, a railroad town eighteen miles away, and had
an opportunity to leave the country unmolested, but failed
to do so, and returned to his home, you may look to this
fact, in connection with the other evidence, in determining
whether he took the horse to convert it to his own use." To
this charge the defendant excepted. The court, at the
request of the State, gave the jury the following charges:
1. If the jury believe, from the evidence, that three or four
weeks before the alleged larceny the revenue officers were in
search of Durrett, and that Durrett then did not take Har-
dy's horse to escape on, they may consider the fact in deter-
mining whether or not the defendant, when he did take the
horse (if the proof shows beyond a reasonable doubt that he
did take him,) took him for the purpose of escaping, or to
feloniously convert him to his own use. 2. If the jury
believe, from the evidence, that there were no revenue officers
in the neighborhood in which the defendant resided, in July,
1877, they can consider that fact in determining whether or
not he was fleeing from arrest by such officers. 3. If the
jury believe, from the evidence, beyond all reasonable doubt,
that the defendant carried Hardy's horse a distance of sev-
enty-five miles and kept it for six days without in any man-
ner informing or attempting to inform Hardy of his taking
the horse, then they can look to that fact in determining

whether or not he, the defendant, thought he had a right to take the horse. 4. Even if the defendant thought he had permission to take the horse, still, if he feloniously took and carried him away with the intention of converting him to his own use, and they believe this beyond all reasonable doubt, from the evidence, then he is guilty." The defendant excepted to the giving of these charges, separately, as the same were given, and requested the court to give the following written charge: "If the jury have a reasonable doubt, under the evidence, whether or not the defendant honestly believed, at the identical time at which the horse was taken, that he had authority from the owner of the horse to take and use the horse to avoid arrest, then the jury should find the defendant not guilty." The court refused this charge, and the defendant duly excepted.

The jury found the defendant guilty as charged, and he was sentenced to four years imprisonment in the penitentiary. From this judgment and sentence, he appeals to this court, assigning as error the rulings of the court in the admission of evidence, and the charges given and refused.

JOHN T. HEFLIN, for appellant.

HENRY C. TOMPKINS, Attorney-General, *contra.*

STONE, J.—Crime is usually composed of act and intent. Hence, collateral and extrinsic facts sometimes become relevant and material testimony, as shedding light on the motive or intent with which the alleged criminal act was done. But care must be exercised not to open too wide a field for extrinsic exploration. To let in collateral or outside facts, the court must be able to perceive that they tend naturally to elucidate the act or intent charged. Their bearing must point directly to *the question* in controversy. It is not enough that they furnish material for comparison. To throw open inquiry to this extent would lead to all the evils which result from a multiplication of issues. The attention of the jury should be confined to pertinent and material issues, and no testimony should be allowed which does not appear to shed some light on these. No arbitrary rule, however, can be laid down which will furnish an unerring guide in every conceivable case. Each case must depend, in large degree, on its own attendant facts and circumstances.—1 Brick. Dig. 505, § 823 *et seq.*

In the present case, there seems to have been no denial that Hardy's horse was taken and carried away by the defendant Durrett. The real controversy was, whether the

[Durrett v. The State.]

taking was felonious, or under a belief that the defendant had the owner's permission to take the horse. The testimony in the record tends to show that the horse was taken in the night time, clandestinely, and no attempt is shown to have been made to prove that the defendant notified the owner that he would take or had taken his horse. Nor is there any evidence tending to show that the prisoner had any intention of returning the horse, or of placing him where the owner could obtain him. The defense attempted to be set up was, that Hardy had given him license to take his horse, that he might escape the revenue officers. A noticeable weakness in this defense is, that if Durrett honestly believed he had or could obtain Hardy's permission to thus use his horse, no excuse is offered why he did not then make personal application to him for the privilege. It is not shown that he was then so pressed by pursuing revenue officers as to have no time to make his wishes known, and thus relieve himself of all imputation of the crime of larceny. These reflections, however, only tend to show the nature of outside evidence that would have been pertinent on the disputed question of intent.

We are not able to perceive what relevancy the friendly relations between Hardy and Durrett, and their whiskey transactions, had to the offense with which Durrett was charged. Neither can we perceive the materiality of the alleged attempt by revenue officers to arrest Durrett—their threats to shoot him, nor his abandoned intention to leave the country by railroad, taking the train at Oxford. These are too remote to furnish any just ground for conclusions affecting the guilt or innocence of the accused. The court did not err in ruling out the second conversation held by the prisoner with the witness Wall. There is nothing in the record tending to show that all took place in one continuous conversation. If such was the case, Shortridge could have proved it. He does not appear to have been examined. As they appear in this record, the conversations were separate and distinct, and proof of one by the State did not authorize the defendant to introduce the other as part and parcel of one continuous conversation.—1 Brick. Dig. 510–11, §§ 875, 881, 883, 884, 889.

It is not usual for courts to interfere and rule out evidence which counsel are willing to let in. Still, if the testimony be immaterial or irrelevant, as the evidence in this case was, such ruling is not an error which would work a reversal. In charging the jury, it should be the aim of the court not to give undue prominence to any phase of fact which the testimony tends to establish. If there be apparent incomplete-

[Durrett v. The State.]

ness, or weakness of proof, on any of the controverted issues in the cause, counsel will usually dwell on this in argument. When there is any legal evidence bearing on the question, its sufficiency or insufficiency becomes a sole question for the jury, under appropriate rules of law, to be laid down by the court. The court may state the testimony which witnesses have deposed to, and should, in a proper case, lay down rules by which the jury is to be guided in weighing it. So, it would not be improper for the court to state and explain to the jury the controverted questions raised on the trial, and to inform them on whom the burden of proof rests in each aspect of the case. This, fairly and impartially done, greatly simplifies the investigation before an average jury. But when parties ask a charge which isolates certain enumerated facts or circumstances, real or supposed, and invoke the instruction of the court on these, as circumstances specially to be weighed in the cause, the usual result is to give such facts and circumstances great, if not undue, prominence before the jury; and, if given, the charge should be accompanied with a fair and candid statement of any facts and circumstances which point in the opposite direction. Less than this is apt to leave on the minds of the jury an impression that the convictions of the presiding judge incline in favor of the party such instructions are supposed to benefit. And the supposed bias is none the less potent and apparent, even though in giving such charge the court adds, these circumstances are to be considered with the other evidence in the cause. We have indulged in these reflections for the purpose of giving our sanction to a rule. The court, in the trial of causes, sits in severe impartiality, and is solicitous only to declare in clear and non-partizan terms, the rules of law by which the jury should be governed. This done, all responsibility is shifted from his shoulders and lodged elsewhere. The jury, under our system, is a necessary functionary of the court, intrusted with very large powers for weal or woe; and, in the performance of this high commission, they can not overestimate the duty they owe to the country, to their solemn oaths—yea, to God himself. If their verdict be not what its name imports, an expression of their legal convictions, as produced on their minds, under the rules of law given them in charge, then they are guilty of perjury, whether the effect of their verdict is to convict or acquit.

But charges, such as we have commented on above, furnish no ground for reversal, merely because of their tendency to mislead. Their mischief may be countervailed by explanatory charges asked; or, as we have seen, by a fuller enumer-

[Forsyth et al. v. Preer, Illges & Co.]

ation by the court, of its own motion, of leading facts and circumstances pointing in each direction. This will repel all imputation of bias in the mind of the court and leave the responsibility where the law has placed it, on the conscience of the jury.

We do not find any error in the charge of the court. All the enumerated circumstances in the several charges given, were such as the jury should have considered in their deliberations. If their tendency was to give those circumstances prominence, this is not enough to secure a reversal. Explanatory charges might have been asked. The vice of the charge asked for defendant and refused, lies in the fact that it bases the right of acquittal on the honest belief of defendant, at the time at which the horse was taken, that he had authority from the owner of the horse to take and use him to avoid arrest. This ignores the important inquiry whether he took the horse to avoid arrest and under such authority. He might have had such authority, or conceived he had, and yet he may have chosen not to avail himself of that license, but in fact took the horse feloniously, for the purpose of converting him to his own use. For the same reasons the court did not err in giving the affirmative charges, which assert the converse of the proposition contained in the charge asked and refused. The error into which the Circuit Court fell, in commenting on testimony that had been ruled out, was promptly redressed when its attention was called to it. This furnishes no ground of reversal.

The judgment of the Circuit Court is affirmed.