[No. 1220.]

# THE STATE OF NEVADA, RESPONDENT, *v.* GEORGE W. WARD, APPELLANT.

INDICTMENT—LARCENY—DIFFERENT ARTICLES.—The indictment properly charged defendant with stealing two horses, one saddle, and one blanket: The stealing of different articles at the same time and place constituted but one crime.

SEPARATION OF JURY—WHEN NEW TRIAL SHOULD NOT BE GRANTED.—A new trial should not be granted, upon the ground of a separation of the jury, where it satisfactorily appears that no juror had any communication with any outside person in relation to the case, or received any impressions except those derived at the trial.

LARCENY—INTENT TO DEPRIVE OWNER OF HIS PROPERTY.—The fact that one took a horse from the premises of its owner, without the latter's knowledge or consent, rode it for a certain distance, and then abandoned it, after removing and concealing the saddle and blanket, are sufficient to justify a finding of intent to permanently deprive the owner of his property, although the person charged has testified that he expected some one to take the property back, or that he expected the animal to stray back.

IDEM—PRESUMPTIONS—BURDEN OF PROOF.—If the jury were satisfied, beyond a reasonable doubt, that defendant used the property in such a manner that the owner would be likely to be permanently deprived of it, the presumption is, that he intended so to use it, and the burden is upon him to rebut such presumption by competent evidence.

INSTRUCTIONS—INTENT OF DEFENDANT.—Several instructions, all having reference to the intent of defendant at the time of his taking the property from the owner, reviewed, and the rulings of the court thereon sustained.

IDEM—TOO MANY INSTRUCTIONS.—The tendency of courts is to give too many instructions. A few plain propositions, embracing the law upon the facts of the case, are greatly preferred, in every case, to a long string of instructions, running into each other, and involved in intricacies, requiring as much elucidation as the facts of the case themselves.

CREDIT TO BE GIVEN TO DEFENDANT'S TESTIMONY—PROVINCE OF JURY.—It is the province of the jury—not the court—to say what credit shall be given to the testimony of the defendant.

EVIDENCE—DECLARATIONS OF CO-DEFENDANT—WHEN ADMISSIBLE—ERROR CURED.—The declarations of a co-defendant made while the conspiracy was pending, and in futherance of the common design, is admissible in evidence. If such declarations are admitted before proof of the conspiracy, the error is cured by subsequent evidence of the conspiracy.

INTENT OF DEFENDANT—MODE OF LEAVING THE COUNTRY—FEAR OF ARREST FOR DEBTS.—The court did not err in refusing to allow defendant to answer the question: "Why it was he did not leave * * * on the train?" A belief by the jury that defendant would have gone away on the cars, and would not have taken the horses, if he had not feared

arrest, would not have tended to show that, since he could not go by rail, he did not intend to deprive the owner permanently of his property and also to depart from the state.

APPEAL from the District Court of the Fourth Judicial District, Elko County.

The instruction referred to in the opinion of the court as being on page 63 of the transcript reads as follows: " In the exercise of a right which the law accords to him, the defendant has testified as a witness in his own behalf, and gives you his version of the facts connected with the transaction out of which this prosecution arose. The fact that he is charged with the commission of a public offense is not a circumstance which, of itself, impairs his credibility; until impeached by some legal means which may be used for that purpose, his evidence is entitled to as much credit as that of any other witness. In considering the effect of evidence, you are not not bound to decide in conformity with the declarations of any number of witnesses, which do not produce conviction on your minds, as against a less number, or a presumption, or other evidence satisfying your minds.   *   *   * "

Refused.

*J. H. Rand,* for Appellant:

I.   The jury, in defiance of the authority of the court, persisted in separating.  Such conduct tended to prevent a fair and due consideration of the case, and the court erred in refusing to grant a new trial upon this ground.  (*People* v. *Douglass,* 4 Cow. 36;[1] *Hines* v. *State,* 8 Humph. 597; *Stone* v. *State,* 4 Id. 27; *Riley* v. *State,* 9 Id. 646; *State* v. *Prescott,* 7 N. H. 287; *McLain* v. *State,* 10 Yerg. 241;[2] *Maher* v. *State,* 3 Minn. 444; *State* v. *Parrant,* 16 Minn. 178; *State* v. *Sherbourne,* Dudley (Ga.) 28; *Madden* v. *State,* 1 Kan. 340; *Early* v. *State,* 1 Tex. App. 248; *People* v. *Gray,* 61 Cal. 164;[3] *Davis* v. *State,* 35 Ind. 496;[4] *Lombardo* v. *Case,* 45 Barb. 95; *Philips* v. *Com.,* 19 Grattan, 485; *Jumperty* v. *People,* 21 Ill. 375; *Woods* v. *State,* 43 Miss. 364; *People* v. *Ransom,* 7 Wend. 417; *Peiffer* v. *Com.,* 15 Penn. St. 468;[5] *State* v. *Harris,* 12 Nev. 421; *State* v. *Madoil,* 12 Fla. 151; *State* v. *Hornsby,* 8 Rob. (La.) 554;[6] *People* v. *Backus,* 5 Cal. 275; *McKinney* v. *People,* 2 Gilman, 540.[7])

II.   The court erred in permitting the witness Brown to

---

1  15 Am. Dec. 332.      2  31 Am. Dec. 573.      3  44 Am. Rep. 549.      4  9 Am. Rep. 760.
  5  53 Am. Dec. 605.                6  41 Am. Dec. 305.                7  43 Am. Dec. 65.

testify to the declarations of defendant Hennessy not made in the presence of defendant Ward.    (1 Green. Ev. 11, 108, 111; 3 Id. 154; 1 Comp. L. 2367; *Fouts* v. *State*, 7 Ohio St. 473; *Clawson* v. *State*, 14 Id. 234; Roscoe's Cr. Ev. 89; Whart. on Ev. 1206.)

III.    The court erred in sustaining the objections of the district attorney to the following question: "Why did you not leave The Wells on the train?"    (*Davis* v. *State*, 3 Tex. App. 99; 1 Whart. on Ev. 36.)

IV.    The jury might have understood from the language used in the instructions given by the court that, in order to escape a verdict of guilty, it was necessary that the defendant should have intended to return the horses to the possession of the owner.    Such is not the law.    (*State* v. *Ryan*, 12 Nev. 401;[1] 1 Bish. Cr. L. 314; Whart. Cr. L. 1786; Roscoe's Cr. Ev. 589.)

V.    The court erred in refusing defendant's instructions. (*State* v. *Ryan*, 12 Nev. 401;[2] *Wilson* v. *People*, 39 N. Y. 461; Bish. Cr. L. 233, 251, 314, 755, 758; Whart. Cr. L. 1786, 1790, 1773; Roscoe's Cr. Ev. 589.)

*W. H. Davenport*, Attorney General, for Respondent:

I.    The indictment is good.    The horses, saddle, and blanket were all taken at the same time; the taking constituted but a single transaction.    (*Waters* v. *People*, 104 Ill. 544; *Hoiles* v. *U. S.*, 3 McArthur D. C. 370; *State* v. *Faulkner*, 32 La. Ann. 725; *State* v. *Lambert*, 9 Nev. 321; *State* v. *McCormack*, 8 Or. 236.)

II.    The motion for a new trial was properly overruled.    The affidavits of the jurors and others showed that the defendant was not prejudiced.    (*Davis* v. *State*, 3 Tex. App. 91; *State* v. *Madoil*, 12 Fla. 151; *People* v. *Boggs*, 20 Cal. 432; *People* v. *Symonds*, 22 Cal. 352; *People* v. *Moore*, 41 Cal. 238; *State* v. *Harris*, 12 Nev. 414;[3] *Lee* v. *McLeod*, 15 Nev. 158; *State* v. *McMahon*, 17 Nev. 273;[4] *State* v. *Gray*, *ante*, 212.)

III.    The declarations of Hennessy to the witness Brown were competent and material.    (3 Greenl. Ev., sec. 93; Whart. Cr. Ev. 698; *State* v. *Cardoza*, 11 S. C. 237; *Avery* v. *State*, 10 Tex. App. 199; *Miller* v. *Dayton*, 57 Iowa, 423; *Jackson* v. *State*, 54 Ala. 234; Whar. Cr. Ev. 698, and notes; *State* v. *Brown*, 7 Or. 186.)

1 28 Am. Rep. 802.    2  28 Am. Rep. 802.    3  46 Am. Rep. 169.    4  55 Am. Rep. 140.

IV. The question, "Why was it that you did not leave Wells on the train?" was irrelevant and immaterial.

By the Court, LEONARD, J.:

Appellant was convicted of the crime of grand larceny. He was jointly indicted with John Hennessy, but had a separate trial.

1. The demurrer to the indictment was properly overruled. The indictment did not charge the commission of two distinct offenses, to wit, grand and petit larceny. The charge was, that defendants willfully and feloniously stole, took, carried, led, and drove away two horses, described, of the value of one hundred and fifty dollars, and, at the same time and place, willfully and feloniously stole, took, and carried away, together with the said two horses, one saddle, of the value of twenty-five dollars, and one blanket of the value of eight dollars, all the property of W. B. Gibbs. The stealing of the horses, saddle, and blanket, at the same time and place, constituted but one crime, and but one offense was charged. A trial and acquittal upon an indictment charging larceny of the horses only would have been a bar against a prosecution for stealing the saddle and blanket. (*Waters* v. *People*, 104 Ill. 544; *State* v. *McCormack*, 8 Or. 236.)

2. It is strenuously urged that the court erred in refusing to grant a new trial by reason of alleged misconduct of the jury in separating, without leave of the court, after retiring to deliberate upon their verdict, and in talking with persons not members of the jury, by which misconduct appellant was prevented from having a fair consideration of his case. The affidavits in support of the claim of misconduct are numerous, and those against it are equally so. We have examined them carefully, but shall not undertake the task of reviewing them in detail. It is undoubtedly the law that the defendant in any criminal case is entitled, as a matter of right, to require, in the first instance, a compliance with the ordinary forms of law to secure him a fair and impartial trial; and if the provisions of law intended for his security are disregarded, he may require satisfactory evidence from the state that he had not been injured by reason of such non-compliance. Conceding that there was a separation, and that the wife of one of the jurors spoke to her husband in the presence of three other

jurors, but not about the case, and that, under the circumstances shown, the burden of proving that there was no prejudice to appellant resulting from the irregularities complained of was upon the state, we feel certain that the court did not err in refusing a new trial upon this ground. The showing made by the state convinced the court below, as it does us, that there was no tampering with any juror; that no juror had any communication with any person other than a juror in relation to the case, or received any impressions except those derived from the trial. (*State* v. *Jones*, 7 Nev. 413; *Davis* v. *State*, 3 Tex. App. 101; *State* v. *Harris*, 12 Nev. 421.)

3. It is contended that the court erred in giving and refusing certain instructions to the jury. Appellant when testifying as a witness in his own behalf, admitted that he and Hennessy went from Wells, on the Central Pacific Railroad, to the ranch of Gibbs, about fifteen miles distant, according to a previous arrangement so to do; and at about nine o'clock in the evening, without consent of the owner, took the two horses, saddle, and blanket described in the indictment, from the premises where they were kept, rode them to a place about twenty miles from the state line, and then returned to a point twelve miles from Toano and the railroad, where they took the saddles from the horses, left them in the sagebrush beside the road, and abandoned the entire property. He testified that neither he nor Hennessy intended to steal the property; that they only took it to use three or four days, to enable them to leave the state; that the intention was that it should be returned to Gibbs; that he made an arrangement with one Jack Thomas, at Wells, the night before the property was taken, to meet him and Hennessy near Six Mile cañon and take the property back to Gibbs; that Thomas did not meet them as agreed, and not wishing to ride the horses into Toano, they left the property, thinking Thomas would get it, and if he failed to do so, the horses would go home any way.

The court instructed the jury that if they were satisfied, beyond a reasonable doubt, that appellant, in connection with Hennessy, took the horses with the intention of permanently depriving the owner of his property, and without intending to return them, it was a felonious intent, and they should find him guilty; that if he took them with the intention of using them temporarily only, and then returning them to their owner,

he was not guilty; that in order to justify the jury in convicting appellant, it was not necessary they should find that he intended to convert the property to his own use, that is, to keep it permanently himself, or dispose of it to others; that the jury were to determine whether or not he made any arrangement with Thomas to take the horses back, but that such arrangement, if made, would amount to nothing, unless entered into in good faith, and appellant really and honestly believed, at the time he took the property, that Thomas would meet him and take the horses back to the owner; that if he took them with the intention of permanently depriving the owner of them, and without really intending to return them, a subsequent abandonment of them, and allowing their owner to recover them again, would not prevent such taking from being grand larceny. On behalf of appellant, the court charged the jury that they should acquit unless they believed from the evidence admitted that appellant, when he took the property, intended to deprive the owner of the same permanently.

From these instructions it is urged that "the jury might have understood that, in order to escape a verdict of guilty, it was necessary that appellant should have intended to return the horses to the possession of Gibbs, and that such is not the law." It is not claimed that it was error to tell the jury that "the appellant was not guilty if he took the horses with the intention of returning them to their owner, after a temporary use," as he had testified his intention was. That was good law, and favorable to him. It was in perfect accord with appellant's theory of the case; and if his counsel thought that from the court's instruction, although correct as far as it went, the jury might think it was necessary that appellant should have intended to return the property, and that such was not the law, he should have asked, in plain language, an instruction covering the point now made.

In order to find appellant guilty, the jury were bound to believe, from all the evidence, that he intended to deprive the owner permanently of his property. The jury did not believe that appellant intended to return it. Having discarded that theory, the intention had to be gathered from acts alone. Now, it may be that a person might take another's property and carry it away, without intending to return it, but without intending a permanent deprivation. His acts, including his

treatment of the property, and the circumstances surrounding the taking, might show the latter intention in the absence of the former. But since the jury, after discarding appellant's *alleged* intention, had to decide, *by acts alone,* as to his *real* intention at the time of taking, and since he is presumed to have intended the natural consequences of his acts, in the absence of an intention to return the property, if the jury were satisfied, beyond a reasonable doubt, that he used the property in such a manner that the owner would be likely to be permanently deprived of it, the presumption is that he intended to so use it, and the burden was upon him to rebut such presumption by competent evidence. So the jury were charged by appellant's eleventh instruction, which declared the law correctly in case he did not intend to return the property.

It is contended, also, that the court erred in refusing to give instructions two, six, seven, eight, and nine asked by appellant. Every correct principle of law embodied in the second request was given by the court in other instructions. But it contained the following, which was properly refused: " * * * and if, from all the evidence, the jury have a reasonable doubt whether or not defendant intended to steal the property, or any part thereof, or only to use it for a limited period of time, and then allow it to return, or be returned, to the owner, then you should acquit the defendant." That would have been a charge to acquit if they found that he intended to use the property temporarily, and then abandon it, after several days' use, a long distance away, regardless of whether he expected, or had reason to expect, that the owner would recover it in the natural course of events, or at all. In regard to this it is enough to say that from such intended use, abandonment, reckless exposure to loss, and other facts in the case, a jury might well find an intention to permanently deprive the owner of his property; and it was not for the court to say that a permanent deprivation was not intended, simply because appellant's primary intention was to use it temporarily, and then forsake it, if such it was.

By the sixth instruction the court was asked to charge that appellant was entitled to an acquittal unless the jury were satisfied, beyond a reasonable doubt, that he and Hennessy "intended to assume property in the property taken, or some portion thereof, or to permanently deprive the owner of his property, or some part thereof." As before stated, in several

other instructions, the court had properly charged concerning the intent necessary to constitute larceny, and that was sufficient. When the wrongful taking and asportation are admitted, as in this instance, the state's case is made out upon proof of a felonious intent at the time of taking; and the intent is felonious when the purpose is to deprive the owner permanently of his property, no matter by what means, whether " by assuming property in the property," or otherwise.

The seventh request is as follows: " The jury are instructed that if they believe, from the evidence in the case, the defendant Ward and his co-defendant Hennessy went to the premises of W. B. Gibbs, in the night-time, and took away therefrom the property described in the indictment, for the purpose of riding the horses, blanket, and saddle to some place near the Central Pacific Railroad, and then to leave the horses, blanket, and saddle at such point, and where the owner would probably recover his property; and not intending to return the said property, or any part thereof, to the possession of the owner themselves, but not intending to make any further use of said property, or to permanently deprive the owner of his ownership in his property, or the use thereof, then the defendant is not guilty of the offense as charged in the indictment, and it is your duty to acquit, and upon the question of *intent* the defendant is entitled to the benefit of every reasonable doubt."

This instruction was ingeniously written, but it was properly refused. It was misleading, and instead of enlightening the jury it would have confused them. The only evidence in the case that would have justified an instruction upon the theory that they intended to leave the property anywhere was the fact itself *that it was left* or abandoned about twelve miles from Toano, and from the railroad; although appellant testified that they did not intend to leave it, but did intend to send it back by Thomas, and that the abandonment was an afterthought. It is urged by the attorney-general that, under such circumstances, appellant was not entitled to an instruction, otherwise correct, upon the theory that defendants intended to leave the property; that appellant knew his intention, and, having stated it, he was not entitled to an instruction upon the theory of subsequent abandonment. We shall not stop to consider this question; nor shall we consider whether appellant could take property as this was taken, for the purpose stated in

the inst tuction, with no intention of returning it, or having it returned, out intending to leave it a long distance away, where the owner would probably recover it, without intending to permanently deprive the owner of it; whether a probability recovery, dependent upon chance and i try of the owner, is sufficient in law to. Nor the imputation of a felonious . But we do not hesitate to say that, in such a case, the finding of a jury that a permanent deprivation of property was intended is supported by the facts stated. (State v. Davis, 38 N. J. Law, 178; State v. Slingerland, ante, 135.)

There was no testimony to the effect that "the owner would probably recover the property" if left where it was abandoned, twelve miles from Toano, or that appellant had good reason to think it would be recovered. He testified that he thought the horses would go home, but that did not tend to show any fact from which the jury could say there was any probability that the owner would recover them. Gibbs, the owner, stated that the horses were born and raised in the vicinity of, and were accustomed to, his ranch. In eight or ten days after they were taken they were found by Gibbs at his ranch. But there was no evidence that, as a rule, horses turned loose, as far away as these were, would go home, or that these would probably do so. Again, as before stated, the only evidence that defendants intended to leave the property anywhere was the fact that it was left at a place about twelve miles from Toano. Upon this state of facts it would have been misleading to have charged the jury upon the hypothesis that "they took the property for the purpose of riding it to some place near the railroad, and then to leave it at such point, and where the owner would probably recover it." The statement should have accorded with the facts. As to the place to which they intended to ride, and there to leave the property, the jury should have been limited to the place where it was left. There may have been many points "near the railroad" from which it would have been much more probable that the owner would recover his property than from the place where it was left, and the language of the instruction permitted the jury to include such points as the place where defendants intended to leave the property.

The eighth request was to the effect that "if the jury found

defendant took and rode the property to some point near the line of the Central Pacific Railroad, and voluntarily abandoned it, and did not intend to make any further use thereof, they uld consider that fact as a circumstance in determining the e of the defendant in taking it." It would have been uncertain which of the several facts enumerated the jury were to consider as a circumstance; but conceding that the fact referred to was the last one mentioned, the jury might have concluded that an intent at the time of abandonment, instead of at the time of taking, to make no further use of the property, was a circumstance for them to consider. This instruction is objectionable, also, for the reasons last expressed concerning appellant's seventh request. In determining appellant's intent, it was the jury's duty to consider all the evidence in the case, and so they were instructed. But, without considering the objections to this request already stated, it must be admitted that if the court erred in refusing to give it, then, after charging the jury to consider all the facts in the case, it would have been equally the court's duty to give others, if asked, upon every important circumstance disclosed at the trial, and explanatory charges for the other side. There must be an end to the giving of instructions, and the tendency of courts is to give too many.

We agree with the supreme court of Missouri: " A few plain propositions, embracing the law upon the facts of the case, are greatly to be preferred, in every case, to a long string of instructions, running into each other, and involved in intricacies, requiring as much elucidation as the facts of the case themselves." (*State* v. *Mix*, 15 Mo. 153.) " This court will not reverse the judgment of the court below for the refusal to give instructions, provided it appears from the record that the law of the case has been laid down properly and fairly by the court in instructions which it did give to the jury. Instructions are to enable the jury to understand the law of the case. A few short, pithy, sententious instructions, embodying the law of the case, will always be better understood, and will have more effect upon the triers of fact, than a long list of instructions loaded with words, generally so involved that it tends to confuse rather than conduct the jury to a proper conclusion." (*State* v. *Floyd*, Id. 250.)

In this case, where the only question of fact was as to

appellant's intention at the time the property was taken, the instructions given and refused cover twenty-six pages of the transcript. "In charging the jury it should be the aim of the court not to give undue prominence to any phase of fact which the testimony tends to establish. If there be apparent incompleteness or weakness of proof on any of the controverted issues in the cause, counsel will usually dwell on this in argument. * * * But when parties ask a charge which isolates certain enumerated facts or circumstances, real or supposed, and invoke the instruction of the court on these, as circumstances especially to be weighed in the cause, the usual result is to give such facts and circumstances great, if not undue, prominence before the jury; and if given, the charge should be accompanied with a fair and candid statement of any facts and circumstances which point to the opposite conclusion. Less than this is apt to leave on the minds of the jury an impression that the convictions of the presiding judge incline in favor of the party such instructions are supposed to benefit; and the supposed bias is none the less patent and apparent, even though, in giving in such charge, the court adds: 'These circumstances are to be considered with the other evidence in the case.'" (*Durrett* v. *State*, 62 Ala. 441; and see *Castro* v. *Illies*, 22 Tex. 503;[1] *McCartney* v. *McMullen*, 38 Ill. 240; *Blankenship* v. *Douglas*, 26 Tex. 230;[2] *State* v. *Homes*, 17 Mo. 379;[3] *Paul's Adm'r*, 16 Mo. 241, 242.)

The same reasoning applies to appellant's tenth request.

As to the ninth it is sufficient to say that, admitting the proposition therein stated to be correct as a legal principle, it was entirely inapplicable to the facts of this case, in view of the many suspicious facts and circumstances disclosed by the evidence.

The instruction found on page sixty-three of the transcript, refused by the court, should not have been given. It was the province of the jury, and not the court, to say what credit should be given to appellant's testimony. The court treated the entire page as one request, and we have no means of knowing that it was error to do so. We think the jury was fairly instructed.

4. W. J. Brown, a witness for the state, who lived about eighteen miles from Wells, and thirty miles from Gibbs's ranch, testified that on the day after the property was taken he saw

1  73 Am. Dec. 277.          2  82 Am. Dec. 608.          3  57 Am. Dec. 269.

appellant and Hennessy at his place, where they got breakfast and fed their horses—those described in the indictment. Witness was asked "if he heard Hennessy say what they were doing." It was admitted that appellant was not present, and his counsel objected to the question because "no foundation had been laid to bind Ward by Hennessy's declaration; that no conspiracy had been shown, and the offense, if any, had been consummated." The objections were overruled, and the witness answered that, to the best of his recollection, Hennessy said: "'We are going out to fetch in some mavericks'; though he might have said, '*I* am going out.'" Witness afterwards said: "I had asked Hennessy what they intended to do. I have a few head of cattle, and I asked him if he intended to bother them. Hennessy said, 'No'; that I was a poor man and had worked hard for what I had, and they would not bother my stock. Hennessy said, first, they would not bother my stock. Ward then came in, and Hennessy said again, in his presence, that they would not bother my stock. Ward said nothing."

At the trial appellant did not pretend that they were, in fact, hunting mavericks. It is claimed by the state that this testimony was material as tending to show that Hennessy's object was to divert suspicion from both defendants. We are of the same opinion, and it becomes necessary, therefore, to decide whether this declaration, made in the absence of appellant, was admissible as against the latter. "In cases of crimes perpetrated by several persons, when once the conspiracy or combination is established, the act or declaration of one conspirator or accomplice, in the prosecution of the enterprise, is considered the act or declaration of all, and therefore imputable to all. All are deemed to assent to, or command, what is said or done by any one in furtherance of the common object." (Whar. Crim. Ev., sec. 698; 3 Greenl. Ev., sec. 94; *Hannon* v. *State*, 5 Tex. App. 550.)

If, as claimed, the declaration in question was not strictly admissible at the time it was received, because the conspiracy had not been fully shown, its admission was not a reversible error, since the conspiracy was shown subsequently. (Whar. Crim. Ev., secs. 698, 698 *a;* 3 Greenl. Ev., sec. 92; *Scott* v. *State*, 30 Ala. 509; *Avery* v. *State*, 10 Tex. App. 210; *State* v. *Cardoza*, 11 S. C. 237.)

The evidence, including the testimony of appellant, shows a

conspiracy, and Hennessy's declaration was admissible, if it was made while the conspiracy was pending, and in furtherance of the common design. Upon this point it is enough to say that, at the time the declaration was made, they were engaged in carrying out what they had previously agreed to do. They had agreed not only to take the horses, etc., but to ride them three or four days to some place near the eastern part of the state, where they could safely take the cars.

In *Scott* v. *State, supra,* the court said: " The strongest argument for the plaintiff in error against admitting as evidence against him the payment of double toll by West is, that the payment was made after the larceny of the watch was, in legal contemplation, complete as to West. * * * Conceding that the payment of the double toll was made after West had done enough to authorize his conviction for the larceny of the watch, yet there is evidence which conduces strongly to show that it was made '*while the conspiracy was pending,* and in furtherance of the common design.' The evidence justifies the conclusion that the conspiracy between West and the plaintiff in error was not confined to the mere felonious taking and carrying away of the watch, but extended to a division of the profits of the larceny at a meeting to be held between them at another place as soon as convenient. Having given to their conspiracy that extent, neither of them, when indicted, has the right to call upon the court to diminish its extent for the purpose of relieving him from any of its consequences." (See also *State* v. *Grant,* 76 Mo. 245; *Miller* v. *Dayton,* 57 Iowa, 429; *State* v. *Brown,* 7 Or. 207.)

The court did not err in admitting Hennessy's declaration.

5. After appellant had testified that he and Hennessy took the property merely for the purpose of riding it three or four days to enable him to leave the state, but that they did not intend to steal; that they expected Thomas would come and return the property to Gibbs; that he told Brown they were getting away from trouble at Wells, etc., — he was asked by his attorney " why it was he did not leave Wells on the train." The state objected to the question, and appellant's attorney stated that, " in connection with said question, he proposed to prove that defendant had contracted a number of debts, aggregating a large sum of money; that he had paid out all the money he had, and had nothing wherewith to pay the debts;

that he had been told and believed his creditors at Wells intended to attach and take away from him every cent he could make; that he intended to go out of the state, and secure employment, and thereby make sufficient money to pay the just claims against him; that he did not believe he could ever pay his creditors if continually sued and harassed by them; that he intended to leave on the east-bound train, but when the train arrived at Wells he saw the constable and justice watching the train, and thought he would be arrested and brought back as an absconding debtor, if he boarded the train; that he knew of several instances where parties owing money had attempted to leave the state, and had been arrested and brought back; that he concluded he could not safely leave Wells on the train, and he and Hennessy agreed to get horses, and ride them to some point near the eastern border of the state, where they could safely take the train and depart."

It is admitted that the reasons offered were no excuse for taking the property; but it is said that since his defense was that he took it, not intending to steal it, but only to use it in getting out of the state, he had the right to explain why he did not go away in the usual manner, on the cars. A man may be guilty of larceny without intending to appropriate the property permanently to his own use. Appellant was guilty if he intended, at the time of the taking, to deprive the owner of it permanently. If the jury had believed that he was afraid of being arrested and brought back, although from the proposed showing his fear was groundless, his testimony would have shown why he went over the country on horseback instead of traveling by rail; just as it would if he had said he did not go on the cars because he had no money to buy a ticket, or because car-riding made him sick, or because he was afraid the cars would run off the track; but whether in taking the horses, no matter why, he was guilty of larceny, would still have depended upon whether he intended to deprive the owner of them permanently, although he would not have taken them at all if he had not feared arrest; and in deciding upon his intent, the jury would have been obliged to judge from facts and circumstances outside of the reason why he did not go by rail. A belief by the jury that he would have gone away on the cars, and would not have taken the horses if he had not feared arrest, would not have tended to show that, since he could not go by rail, he did

not intend to deprive the owner permanently of his property, and also to depart from the state.

The record discloses no reversible error, and the order and judgment appealed from are affirmed.