## STATE *v.* ROBISON

No. 2928

December 28, 1931.                    6 P.(2d)433.

*Samuel A. King* and *Louis E. Callis,* for Appellant:

*M. A. Diskin,* Attorney-General; *Wm. J. Forman,* Deputy Attorney-General, and *Guy E. Baker,* District Attorney, for the State:

## OPINION

By the Court, DUCKER, J.:

The defendant, convicted of murder of the second degree for the killing of John Rowland, has appealed from the judgment and from the order denying him a new trial. He assigns many errors, forty-three in number, but his counsel in their briefs discuss only a part of the errors claimed. It is not assigned as a ground of reversal that the evidence is insufficient to support the verdict of murder of the second degree. However, in their argument as to the error of a certain instruction, counsel contend that the evidence is so insufficient and, when the case was submitted for consideration and decision, called our attention to a recent statute which is intended to clothe a trial or appellate court with authority to modify a judgment in a criminal case without granting or ordering a new trial if the evidence shows the defendant to be not guilty of the degree of crime of which he was convicted, but guilty of a lesser crime included therein. Stats. 1931, c. 41, sec. 1, par. 6, p. 48. Consequently we will consider the evidence with reference to its sufficiency.

As the defendant admitted the killing and sought to justify under a claim of self-defense, much of the evidence introduced by the state to connect him with the homicide may be omitted in the following statement of facts:

The defendant shot and killed John Rowland in the rear of the former's home in East Ely, White Pine

County, Nevada, on September 12, 1929, at about 3:30 a. m. The killing was done with a pistol. Rowland was unarmed. His body was found that evening about 6 o'clock in the back part of his automobile parked near the Steptoe Hospital in East Ely. The body was covered with a blanket when found. The automobile had been seen standing there between 5:30 and 6 o'clock that morning and again at noon. An autopsy revealed a wound in the face caused by a pistol bullet which entered the head of deceased about an inch below the eye and exploded into a number of fragments in the brain, causing instant death. There was no other bullet wound in the body.

The defendant was arrested at about 11:30 o'clock on the night of September 13, 1929, at a construction camp where he was employed, about 25 miles from the scene of the killing, and brought to Ely by the officers that night. A pistol belonging to defendant was found in his car at the camp. On the same night in the sheriff's office in the presence of the sheriff, his deputies, the district attorney of White Pine County, and a stenographer, the defendant made a statement. He appeared to be very nervous during the time and took seven or eight drinks out of a jug he had brought with him from the camp, and which he said contained moonshine whisky. The statement was taken down in shorthand by the stenographer and transcribed by her. It was introduced in evidence by the prosecution. In this statement, among other matters, defendant admitted killing Rowland and placing his body in the latter's car in which it was found that evening.

At the trial of the case defendant was a witness in his own behalf. His testimony, summarized, was as follows: Defendant, who was thirty-six years of age, had been acquainted with John Rowland in White Pine County for approximately thirty years. Their families had been neighbors in the farming business and on intimate terms for a number of years. Deceased and defendant had been schoolmates and had continued to be fast friends after they had attained manhood and

to the time of the homicide. Both were married. On or about the 28th day of August, 1929, defendant had trouble with his wife on account of his getting drunk, and left home. From then on until the 5th of September he stayed part of the time in town, part of the time in the country at Spring Valley, and the rest of the time at the home of John Rowland, who lived in Ely, a city adjacent to East Ely. Mrs. Rowland was away from home during that time. He went there at the invitation of Rowland. While staying at the latter's home he slept in the same bed with him. On the 5th of September defendant took some wearing apparel to Rowland's home and also a five-gallon keg of whisky, which he put in the attic. Defendant was subsequently employed and went to work at the construction camp. He returned to Ely on the evening of the 11th of September; after attending a meeting of the Legion at the Legion Hall, he went to Rowland's house at about 10 o'clock to get some whisky. He found Rowland at home and there was considerable drinking. They consumed a quart or more of moonshine whisky and finally went to bed together, both being intoxicated. They had several drinks after they went to bed and got to talking about defendant's domestic troubles. Rowland stated he had seen defendant's wife uptown that day and had taken her home. Robison asked him why he had not told him that today, and Rowland became angered and said he was going to whip defendant. He hit the latter in the neck and they landed on the floor. While Rowland was sitting on him he hit defendant twice more in the neck and said he would kill him. Defendant said, "If that is the way you feel about it I'll get out of here." There was another discussion about defendant's going home, and Rowland wanted to go to defendant's home and settle the differences between defendant and his wife. Robison and Rowland both dressed and the former went out and got into his car and drove away. Just before defendant left, Rowland went to get his car and defendant followed him down to his garage and told him it wasn't necessary to have.

him go down home with him, and furthermore that he didn't intend to go home but was going back to his job. Rowland got into his car, turned the lights on, and backed the car out of the garage. After driving about awhile, defendant drove to the rear of his place and found Rowland's car parked there near the back gate. He drove past it a little ways, stopped his car, got out, and walked in the back gate. After walking around the house and seeing nobody, he walked back out of the gate to the car and had started to walk back. Just as he was stepping in at the gate he met Rowland coming out. Defendant said: "John, I thought I told you you didn't need to come down here. Get in your car and go home." John said, "You s—— of a b——, I'll kill you," and hit defendant in the chest and knocked him through the gate. Defendant said, "John, I'll not be killed by you." John said, "You s—— of a b——, it's my life or yours right now." As he said this he pointed his left finger at defendant and reached back quickly with his right hand to his right hip pocket. Defendant immediately drew his gun and there was a grapple. Rowland got hold of defendant's gun and it was discharged. Defendant drew his gun he said for the purpose of then and there defending his life or preventing himself from receiving great bodily harm. He did not intend to shoot Rowland unless it had to be done. He did not know whether Rowland had a gun or not, but he knew if he did not deceased would beat him to death. Rowland was six feet in height and a very strong man, who could easily overpower defendant in a physical contest. (Rowland's large stature and great physical strength was testified to by other witnesses.) Rowland grabbed the gun near the barrel at the instant it was discharged. He fell forward on his face and defendant did not touch him or in any manner attempt to beat him or use the gun on him. He stepped up to him to see if he had a gun on him. Immediately thereafter defendant started to go to the telephone office to apprise the sheriff of the killing but changed his mind. He thought that Rowland might not be dead and felt

his pulse to ascertain if he was alive. He then loaded the body into Rowland's car and drove towards the Steptoe Hospital thinking he might get him into the hospital. Before reaching the hospital he felt the pulse again and knew that Rowland was dead. He ran the car off the right side of the road and left it there. He was in an intoxicated condition and was laboring under great excitement. He thought if he left the car there he would probably not be implicated. Defendant then went to his home and told his wife he had killed John Rowland. She told him to call up the sheriff and insisted upon his doing so. He told her if he called up the sheriff he would be locked up. He changed his clothing and destroyed the clothes he had taken off, took a coal shovel and shoveled up the blood stains in the dirt, and put the contents into the ash can. He put ashes and dirt over the stains that were left on the ground. Defendant then got his traveling bag and the five-gallon keg of whisky he had brought from Rowland's house and carried them to a store uptown. From there he went to secure a mechanic to fix his car. After the mechanic got his car going he bid his wife good-bye and started to drive back to the construction camp. He left between 7 and 8 o'clock on the morning of the 13th of September. On the way out of town he turned and drove back to Rowland's car. The reason he drove back to this car was to see if the part the mechanic found to be missing from his car was there. He thought Rowland must have taken the part out of his car, and defendant in his drunken condition thought that was the only thing that could connect him up with the killing of Rowland. He opened the door of Rowland's car and looked in the pockets of the deceased for the part but did not find it. He then put a blanket that was in the car over the body, closed the door, and drove away to the construction camp. He had the pistol with him with which he did the killing. During the day his employer asked him if he had heard of his friend John Rowland being killed. He pretended not to know anything about it except that

he had heard that some one had been killed in East Ely. He said: "That's too bad. That means I have lost my best friend." He was in a tent and had retired when the officers came and arrested him for the killing of John Rowland.

Mrs. Edith Robison, defendant's wife, was a witness for the defense. In substance, the testimony she gave which had any bearing on the killing, the motive for it, or his claim of self-defense, was as follows: They had been married ten years. After their marriage they first resided at the Ranger Station in Spring Valley where he had a position as forest ranger. He continued to render service in that capacity for about eight years. Just after that service had terminated they moved to East Ely. She had known deceased and his wife for eighteen years. Their relations were very pleasant and friendly and the Rowlands were frequent visitors at her home. For a week or more prior to the killing defendant had been drinking and her objection to this had caused friction between them, and he had left home. He returned a short time on the 5th of September, stating that he had obtained employment, and there was a partial adjustment of their trouble. She saw him no more until the early morning of the 12th of September shortly after the killing. On the 11th of September she had seen Rowland in front of the post office and a few minutes later he met her and offered to drive her home. While he was doing so he made inquiries as to whether she and her husband had settled their trouble and made some suggestions towards composing their differences. On more than one occasion he had spoken to her about her husband drinking with the end in view of doing something to stop it. On the early morning of September 12th she was at home in bed when she heard a gunshot. Just before she had heard footsteps passing the bedroom window on the outside. She had heard them twice at an interval of about a minute and a half. Prior to the hearing of footsteps she had heard an automobile come up and stop. This was a minute or so before she heard the footsteps the first time. Between the time

she heard the footsteps the last time and the shot she heard no loud voices quarreling or disturbance of any kind. When she heard the shot she got out of bed and looked out of the window which faced the alley, but was unable to see anything. She returned to her bed. This was about 3:20 o'clock in the morning. About one-half hour after she heard the shot she heard the noise of some one trying to start a car. Shortly afterwards her husband came in the house drunk. He said: "Mama, I've done it. I've killed my best friend, John Rowland." She said: "Why did you do it?" He said: "Because he threatened my life and I did it to protect myself." She said: "Call up the sheriff and give yourself up." He said, "I think that will be the best thing to do," but hesitated and said: "Well, they have no evidence against me that I committed the crime." She said, "I pleaded with him for some time and he still said they had no evidence to connect him with the crime." She said: "Is he dead?" He said: "Yes, I started to the hospital with him and found he was dead and I turned round and was going to take him to the sheriff's office and I thought no one would know I did it." And he said it was down by the Windrus Hospital. He said he left it there in Rowland's own car.

He suggested burning the clothing that was stained with blood, and after changing did so, burning them in the kitchen stove. He covered up the bloody spot outside and left the house at about 6:30 a. m. saying he was going to the camp. She said that everything she had done in the affair was through love and affection for her husband and her children. She said that Mrs. Nell Carpenter, a sister of deceased, came to see her on the 15th of September and they had a conversation about the unfortunate affair. She denied saying to Mrs. Carpenter: "When Lloyd told me he had shot John, I said, 'Lloyd, please if you are so low as to do such a dirty trick, take John to a doctor and give yourself up,' or that he had said: 'He is dead, for I saw to that and you keep your mouth shut or you will get just what he did.'" Mrs. Carpenter testified as a witness for the prosecution

and stated that Mrs. Robison had made such statements to her. Mrs. Robison could not recollect of having told the sheriff that her husband had objected to her having ridden from McGill to Ely in a truck with John Rowland. The sheriff, testifying for the prosecution, stated that she told him shortly after the killing of this incident, and that her husband was extremely jealous. The sheriff also testified that she told him when Lloyd came into the house after the shooting he told her he saw John coming out of the gate and pulled his gun and shot him.

The foregoing summarization coincides with the evidence of the prosecution as to the time and place of the killing of John Rowland by the defendant, the finding of the body in the former's car, and subsequent arrest of defendant at the construction camp.

■ The evidence is, we think, sufficient to support the verdict of murder of the second degree. Consequently we could not reverse the judgment on the ground of insufficiency of the evidence, nor are we authorized by statutes of 1931 to modify the judgment to one of manslaughter. The statute does not purport to clothe the court with power to modify a judgment in a criminal case without giving or ordering a new trial, as a matter of leniency, but only when the judgment is not supported by the evidence which does show the defendant guilty of a lesser degree of the crime for which he was convicted, or of a lesser crime included therein. There was, however, as we have indicated, evidence upon which the jury could legally base a verdict of murder. While there was no witness to the killing other than defendant, who asserted self-defense, the jurors were of course not bound by his testimony. They had a right to consider, from his conduct after the killing and until his arrest, that his testimony as to the act being done in necessary self-defense was unreliable. It was certainly unnatural for one who had slain his best friend and under the dire necessity of preserving his own life to refrain from divulging the killing and to attempt to remove all traces of it

from his person and his premises. On the other hand, the natural promptings of a heart stirred by the consciousness of innocence, and feeling of regret, would be expected to cause the defendant to declare at the earliest opportunity the exigency which made it necessary for him to kill his friend.

It is evident from the verdict that the jury, moved by these considerations, disbelieved defendant's testimony as to his plea of self-defense. The defendant therefore failed to sustain the burden cast upon him by section 10081 of the N. C. L., and there is no other evidence in the record which tends to mitigate, justify, or excuse the homicide. Besides, there were other circumstances which the jury had the right to consider as incriminating. The circumstances of the empty shell ejected from the defendant's pistol immediately after he fired the fatal shot, being found at some distance from the blood spot where deceased fell, and the absence of any loud talk immediately prior to the shooting as testified to by witnesses near the scene of the killing, were circumstances proper to be considered in connection with defendant's conduct after the killing as tending to show the commission of the crime found by the jury.

In their brief, counsel for defendant discuss a number of errors which they claim the lower court committed in overruling defendant's objections to numerous questions asked of Mrs. Robison on cross-examination, to numerous questions asked of the defendant on cross-examination, and to certain questions asked of the witnesses Mrs. Nell Carpenter and Sheriff Nicholson by the prosecution on rebuttal. The questions were all so obviously proper that we deem it unnecessary to state them, or the evidence which made them proper. It is sufficient to say that we have examined these assignments with the care which the nature of the case requires and find that the court committed no error in these respects.

██ It is alleged that the district attorney was guilty of misconduct in his remarks to the jury during his

closing argument which was prejudicial to the defendant. The district attorney in his closing remarks to the jury said: "That you jurors must now decide whether a man can be shot down in cold blood and (the killer) go free in the State of Nevada." (The words in parenthesis are ours.)

Counsel for defendant objected to the remarks at the time and moved the court to direct the jury to disregard the statement. The court denied the motion. The making of the statement objected to was not misconduct. The district attorney was justified in assuming from the evidence that the defendant was guilty of the crime charged in the information and to characterize it as such. State v. Holbrook, 153 La. 1025, 97 So. 27. "In cold blood" is a term commonly used to designate a homicide in which it is believed there are no circumstances in mitigation or to justify or excuse the killing. That the counsel used this term instead of murder of the first degree, or deliberate or premeditated murder, or any other term or word of similar signification, is unimportant. In argument a district attorney is entitled to state to the jury any fact or facts which the evidence tends to establish, or any legitimate inference which may be drawn from such evidence. Washington v. State, 86 Fla. 533, 98 So. 605. The jury had the power to acquit the defendant even though the evidence established that he was guilty of murder, and we do not think that he was prejudiced by the way the district attorney stated the proposition.

Counsel for defendant also objected to and assigned as misconduct remarks of the district attorney to the court stating his purpose in asking certain questions. We see no fault in the statement.

The refusal of the court to give five of the instructions offered by defendant is in each instance assigned as error. We will examine these in their order. In defendant's request No. 2 the court was asked to instruct the jury as follows: "In this case some evidence has been offered by the state by witnesses Mrs. Carpenter and Sheriff Nicholson, wherein they attempt to repeat

and detail certain conversations had with the wife of the defendant. I therefore charge you in this connection that testimony of this character should be received with care and caution, for it is hard for the human memory or mind to retain the exact words spoken and to enable the party attempting to repeat them to thereafter repeat them accurately, and it is ofttimes hard to repeat the same in a way that will convey the exact thought intended to be conveyed in the first instance, and for this reason any testimony given with respect to conversations of this kind should be considered by you with care and caution."

The court was not authorized to disparage the value of the testimony as was designed by the proposed instruction, and therefore properly refused it. State v. Simas, 25 Nev. 432, 62 P. 242. The weight of the testimony was for the jury to determine without the aid of the court.

■ Defendant's proposed instruction No. 3 contained a summarization of his testimony and charged the jury to acquit if they found the same to be true. It was properly refused. It marshaled a number of circumstances which defendant's testimony sought to prove which had no bearing upon his defense, and those portions of it which were applicable to material testimony were substantially covered by other instructions. State v. Ward, 19 Nev. 297, 10 P. 133, 138; State v. Buralli, 27 Nev. 41, 71 P. 532.

■ The trial court in this case gave forty-four instructions. These, to say the least, were ample to cover every phase of the case, especially as the facts were in no wise complicated. This court has repeatedly stated that the tendency is to give too many instructions. It will not be amiss to repeat here what was quoted with approval in State v. Ward, supra: "This court will not reverse the judgment of the court below for the refusal to give instructions, provided it appears from the record that the law of the case has been laid down properly and fairly by the court in instructions which it did give to

the jury. Instructions are to enable the jury to understand the law of the case. A few short, pithy, sententious instructions, embodying the law of the case, will always be better understood, and will have more effect upon the triers of fact, than a long list of instructions loaded with words, generally so involved that it tends to confuse rather than conduct the jury to a proper conclusion."

■ Defendant's proposed instruction No. 4, refused by the trial court, reads as follows: "If the defendant had reasonable cause to believe from the words, acts and conduct of the deceased that he had a design to do the defendant some great bodily ·injury, and that such design was about to be accomplished, then the defendant had the right to act on appearances and shoot the deceased if necessary, to prevent the accomplishment of the design. And, in this connection, the jury are further instructed that the defendant was not required to nicely gauge the force used, but that he was justified in using such force and means as appeared to him reasonably necessary under the circumstances."

The principle applicable to the defense of self-defense stated in the foregoing offer was correctly declared in two other instructions given by the court. Its refusal was therefore proper.

■ Defendant's proposed instruction No. 6 stated that there was no evidence offered or received that would warrant a verdict of guilty of murder of the second degree, and directed the jury to return a verdict of not guilty of murder of that degree. We have already pointed out the evidence which warranted the refusal of this instruction. Its refusal was therefore proper.

■ Defendant's proposed instruction No. 7 stated that there was no evidence from which the jury might find the defendant guilty of murder of the first degree and directed the jury to acquit him of murder of the first degree. We are of the opinion that the evidence was sufficient to support a verdict of murder of that

degree. However, the defendant was not convicted of murder of the first degree and consequently could not have been prejudiced by the refusal of this instruction even though a lack of evidence as to premeditation warranted such an instruction.

■ Instruction No. 13 given by the court reads, in part: "And in this case even if you should believe from the evidence that deceased commenced the encounter in question and was the first to offer violence, but further believe from the evidence, beyond a reasonable doubt, that the defendant could, by making a reasonable effort, have avoided or safely withdrawn from it, and thereby avoided further trouble, and that he made no effort to do so, but voluntarily entered into and continued the encounter and shot and killed the deceased, then I charge you that the killing of the deceased could not be excused or justified on the ground of self defense and you would have no right to acquit the defendant on that ground."

Defendant contended that this instruction was inapplicable, in that there was no evidence tending to show that defendant voluntarily entered into and continued the contest or that he could have safely withdrawn from it and thus have avoided further trouble. We think that there was evidence of this character sufficient to justify the assumptions. Defendant testified that Rowland was the aggressor, and to the imminence of danger to him from the attack on account of Rowland's threat to kill, his threatening attitude and great strength, and on account of his being close enough to get hold of defendant's gun as it was discharged, it is true, yet, as we have stated, the jurors were not bound by this testimony. And there was other evidence in this connection which they had a right to consider. The deceased was unarmed, and the defendant, who had known him intimately from childhood, knew that it was his custom to go unarmed.

There was evidence which tended to show that defendant voluntarily entered into the contest and was willing to provoke a continuance of it. In his statement to the officer introduced in evidence by the prosecution he said:

"I met John coming out of the yard. He was just coming out of the back gate when I met him. Before he said anything or I did we stopped and I said: 'John, get in your car and go home.' John hit me with his left hand and knocked me back a little. I said, 'John, you have beat up on me enough. Get in your car and go home,' and I said, 'You s—— of a b—— get in your car and go home. I won't be killed by you.' I said, 'John, get in your car and go home,' and he said, 'One of us has to die.' I tried to talk him out of it then and he didn't give me a chance to talk and he said, 'It is your life or mine.' When he said that he pointed his finger at me and reached for his hip pocket. I fired and John fell."

If this was a true version, the application of the vile epithet to Rowland by the defendant was certainly calculated to provoke a continuance of the assault. As to whether defendant could have safely withdrawn from the contest, if there was a contest, it was proper for the jury to consider the physical fact which the evidence tended to show, as we have previously stated, that the empty shell ejected from defendant's pistol immediately after the fatal shot was found some distance from the blood spot on the ground. This, together with the absence of any loud talk as testified to by several witnesses who were near the scene, the defendant's subsequent conduct, tended to negative self-defense. The instruction was applicable for these reasons. But it is also contended that it is an erroneous statement of law, and in support of this contention we are referred to the case of State v. Grimmett, 33 Nev. 531, 112 P. 273. The law was correctly stated in the foregoing case, but the facts were different from the case at bar. In State v. Grimmett the "evidence introduced in behalf of the state and also of the defendant," as stated by this court, "conclusively proves that Baker was the aggressor in the difficulty, which resulted in the loss of his life, and that it was necessary for the defendant to kill him in order to preserve his own." The court held that under such circumstances it was not necessary to flee for safety,

but that the defendant had the right to stand his ground and slay his adversary. It appeared that the defendant in State v. Grimmett had not voluntarily sought, provoked, invited, or willingly engaged in the difficulty. On these points the evidence was conclusive. Here the evidence was such that the jury could say that the defendant was the assailant.

■ The rule of law declaring that a person assailed need not retreat is based upon the assumption that he is not at fault in commencing the encounter. If he is at fault in bringing on the encounter, before he can justify the killing it must appear that he had in good faith endeavored to decline any further struggle before the mortal blow was given. Section 10084, N. C. L. For these reasons we think the instruction was not erroneous. On the whole the jury was fully and fairly instructed.

The judgment is affirmed.