COMMONWEALTH *vs.* GODFREY L. CABOT & others.
SAME *vs.* MICHAEL J. HAYES & others.

Suffolk.    October 20, 21, 1921. — March 14, 1922.

Present: RUGG, C.J., CROSBY, CARROLL, & JENNEY, JJ.

*Larceny. Receiving Stolen Property. Pleading, Criminal,* Indictment, Bill of particulars. *Practice, Criminal,* Variance, Trial of indictments together, Acquittal by reason of a variance.

While a thing stolen must be of some value to be the subject of an indictment for larceny or for buying it, receiving it or aiding in its concealment after it is stolen, it need not be an article having any special appreciable or market value.

An indictment in several counts charged the buying, receiving or aiding in the concealment of property of a certain lawyer, specifically described as "two sheets of paper being copies of certain letters, . . . one other sheet of paper being an unsigned affidavit of" a client of the lawyer, "one other sheet of paper being a copy of a declaration in" an action being prosecuted for a client by the lawyer, a letter and a photograph, and a certain affidavit, the defendants knowing that the property had been stolen. The alleged owner of the property testified that the intrinsic value of the various articles of property was not more than a few dollars, that some of the papers were of value to him because they involved his reputation, that the "market value of the copies of the . . . letters

was in the hundreds of thousands of dollars in . . . [his] opinion, at that time." *Held*, that findings, that the several articles alleged to have been stolen were of some value, were warranted.

An objection, that in sundry counts of an indictment for buying, receiving or aiding in the concealment of "one letter," "one photograph," and "one affidavit," knowing them to be stolen, the articles were not described as sheets of paper, did not entitle the defendant to an acquittal on the ground of variance, where it appeared that the question of the sufficiency of the description of the articles mentioned in the indictment had not been raised by him by appropriate action before the trial.

At the trial of the indictment above described, there was evidence tending to show that, when the events occurred, the defendant charged with receiving the copies of letters, the copy of declaration and the photograph, knowing them to have been stolen, was counsel for a bar association in proceedings before a special committee of the grievance committee of that association to investigate among other things the conduct of the lawyer whose property they were alleged to be; that the complainant before the committee employed the alleged thief as a detective, and that he, at the instigation of his employer and of the defendant, secured employment in the lawyer's office in October, 1919, and while so employed took the articles described and gave them to the defendant, who knew whence they had been taken and the circumstances of the taking; that the articles were not returned to the detective, who, when he took them, did not intend to return them to the lawyer and understood that they were taken to be used in an investigation which was then being held before the sub-committee of the bar association; that at a meeting of that sub-committee in July, 1920, it appeared that the articles had been handed to the defendant by the detective, and that shortly after that date they were returned to the lawyer. *Held*, that

(1) Even if the papers and photograph were taken solely for use in the inquiry then pending, that purpose did not require a finding that there was no intent permanently to deprive the owner of their possession as distinguished from a temporary or passing use;

(2) It could not have been ruled properly as a matter of law that, when the articles were taken by the defendant and received by the defendant, there was no intent permanently to deprive the owner of his property;

(3) The evidence justified a finding that the possession of the property was not that of the owner or for a temporary use;

(4) It does not lie in the mouth of one who has taken property by stealth or violence, or of one who has wrongfully received property with knowledge of such facts, to claim that as matter of law a definite intent to keep it permanently must be proven expressly: such an intent may be inferred from all the facts;

(5) The defendant having known the circumstances in which the property had been taken, it was no defence that he thought his conduct was justifiable.

The evidence of the Commonwealth in support of that count of the indictment above described, charging that the defendant bought, received and aided in the concealment of a certain affidavit, related to the stealing and receiving of a copy of the affidavit described. The paper writing intended to be referred to in the indictment was well known to the defendant and he made no objection to its admission in evidence. The defendant had not moved for particulars but, at the close of the evidence, asked for rulings that there was such a variance between the allegation and the proof, or such a misdescription of the property as to

require a verdict of not guilty on that count, and also contended that the difference between the allegation and the proof was not merely a variance or a misdescription, but that the indictment contained an accurate description of property not in fact received and that the difficulty was not cured by G. L. c. 277, § 35. *Held,* that

(1) The statute referred to, G. L. c. 277, is remedial and should be construed with reasonable liberality and so as to give effect to all its provisions;

(2) No confusion, surprise nor inability to make a proper defence appeared;

(3) The gist of the accusation was the theft of a paper on which the copy of an affidavit appeared, and the question whether that paper had upon it an original instrument or a copy thereof did not go to the substance of the charge: the defendants were not prejudiced in their defence;

(4) The offence was correctly set forth in its essential particulars; no substitution of offences was caused;

(5) The ruling asked for properly was refused.

In the closing argument of the government's counsel at the trial of the indictment above described, were passages which were wholly unjustifiable and most prejudicial in character. During the argument, the defendant's counsel called attention of the judge thereto and asked whether the argument should be interrupted. The judge answered in the negative, assuring the defendant's counsel that he "would look out for the defendants' rights," which led the defendant's counsel "not to interrupt in the course of the argument." The government's counsel was not aware for many days after the trial that the defendant's counsel had objected to the argument while it was being made. At the close of the arguments, the defendant's counsel with particularity called attention to the objectionable character of the argument, stating that, if the judge thought the case nevertheless should go to the jury, the defendant desired "an exception in each instance." The judge's charge, while dealing with the subject, did so inadequately. At the close of the charge the defendant saved "an exception to letting the case go to the jury in view of the prejudicial argument made for the Commonwealth." *Held,* that

(1) The defendant objected seasonably to the character of the argument of the Commonwealth;

(2) Neither the fact that the Commonwealth's attorney did not know of the defendant's objection during the argument, nor the fact that the defendant's attorney did not interrupt, palliated, extenuated or excused the conduct of the Commonwealth's attorney;

(3) While the judge might well have directed a discontinuance of the objectionable line of argument, he was not obliged to pursue this course, which, undoubtedly, is ordinarily the wiser one;

(4) Having permitted the argument to continue, it was the duty of the judge to emphasize the fact that the argument had been grossly improper; to point out in plain, unmistakable language the particulars in which it was unwarranted and to instruct the jury to cast aside in their deliberations the improper considerations that had been presented to them, using such clear and cogent language as would correct the obviously harmful effect of the argument;

(5) Up to the end of the charge no error in law had arisen because of the argument and, to protect his rights, the defendant at the close of the charge should have saved an exception to the failure of the judge adequately to deal with the improper conduct of the government's counsel;

(6) The exception saved at the close of the arguments was anticipatory only and was not sufficient;

(7) The exception at the end of the charge "to letting the case go to the jury in view of the prejudicial argument made for the Commonwealth," was not an exception to the inadequate character of the charge;

(8) The defendant having failed to call to the attention of the judge at the end of the charge errors and omissions therein in this respect, and to save an exception then because of such errors and omissions, there was no error entitling him to a new trial as a matter of law.

A bill of exceptions setting forth an exception saved to a ruling by a judge other than the judge who allowed the bill does not properly bring the subject matter thereof before this court.

An indictment for conspiracy to steal and an indictment including counts for larceny and for buying, receiving and aiding in the concealment of goods known to be stolen were tried together. At the close of the evidence, a verdict of acquittal on the ground of variance was ordered and returned as to the indictment for conspiracy. Two of the defendants charged in the second indictment with buying, receiving and aiding in the concealment of the stolen goods moved that certain evidence, specified by them, be stricken out as not bearing on the issues on trial under the second indictment. *Held,* that

(1) The judge was not bound to scan minutely the evidence that had been admitted, and properly could overrule the motion if the evidence referred to therein was relevant to the issues on trial in the indictment finally submitted to the jury;

(2) The evidence to which the defendants' motion referred, being carefully examined, was admissible under the second indictment, either as showing the intent with which the articles described in the indictment had been taken or the knowledge of the facts which the defendants had when the articles were received by them.

The question of former jeopardy is not determined by reference alone to the form of verdict, and the mere inclusion of the reasons for the direction of the verdict does not prevent the defendant from fully availing himself of it as a defence in subsequent criminal proceedings.

When a former acquittal is pleaded in bar, two kinds of matters are involved: those of record consisting of the former proceedings and the acquittal, and those of fact which involve the identity of the offence and of the person alleged to have been guilty.

Sections 7, 8 of G. L. c. 263, do not change the fundamental principle that a person cannot twice be put in jeopardy for the same crime.

A defendant under indictment is not prejudiced in his legal right by an entry, by order of the judge presiding at the trial, of a verdict of "not guilty on the ground of a variance," even if a general verdict of acquittal should have been entered.

INDICTMENT, found and returned on November 18, 1920, charging that Godfrey L. Cabot, Robert D. Weston, Hector M. Holmes and Oswin T. Bourdon on November 1, 1919, "conspired together to steal the property, moneys, goods and chattels of one Daniel H. Coakley;" also an

INDICTMENT in six counts, found and returned on November 20, 1920, charging larcenies by Michael J. Hayes on December 1, 1919, of "property" of Daniel H. Coakley, in the first count of two sheets of paper, being copies of certain letters of the value of not more than $100, one other sheet of paper, being an unsigned affidavit of Mabelle Adamson of the value of not more than $100, one other sheet of paper, being a copy of a declaration in the case of Mabelle Adamson *v.* Hollis H. Hunnewell of the value of not more than $100; in the third count of one letter of the value of not more than $100, one photograph of the value of not more than $100, and in the fifth count of one affidavit of one George E. Thompson of Bangor, Maine, of the value of not more than $100. In the second and fourth counts the indictment charged Robert D. Weston with buying, receiving and aiding in the concealment of the property which was the subject matter of the first and third counts, and in the sixth count alleged that Hector M. Holmes bought, received and aided in the concealment of the property which was the subject matter of the fifth count.

The defendant Bourdon pleaded guilty to the first indictment and the defendant Hayes to those counts of the second indictment applicable to him. The indictments then were tried together as to the remaining defendants and the remaining counts before *Fessenden,* J. Material evidence and portions of the argument of the Commonwealth's counsel and of the judge's charge are described in the opinion.

At the close of the evidence by order of the judge the jury returned verdicts of "not guilty on the ground of a variance" as to each defendant under the first indictment; and each defendant alleged an exception to such limitation of the verdict.

After the discharge of the defendants under the first indictment the defendants Weston and Holmes moved that certain specified evidence, admitted under the first indictment, which, they alleged, was not relevant to the matters in issue under the second, be stricken out. The description of the evidence in the record and the judge's rulings thereon, were as follows:

"All the evidence of what occurred before the first papers were taken from Mr. Coakley's office. [The judge refused to strike out this evidence.]

"Evidence of Hayes that he was in the employ of Cabot at $30

a week. [The judge ruled that any evidence of the sort referred to in the last three paragraphs which is not shown by the evidence in the case to have been known to the defendants here now and the purposes for which he was employed by Cabot, if he was, that evidence he should not strike out but the rest should be stricken out.]

"Evidence of Hayes that he was in receipt of a large salary from Cabot. [The judge refused to strike this out.]

"Testimony of Hayes that he talked with Cabot and with Weston, before getting a job in Coakley's office, at 400 Boylston street, that a room was hired by Cabot for the purpose of the meetings regarding the investigation of Coakley. [The judge ruled that if there was no evidence that the substance of this testimony was known to Holmes, then it could not be considered against him. The judge refused to strike it out so far as the other defendant was concerned.]

"Testimony of Hayes of the conversation in the presence of Cabot, Mr. Weston, Mr. Perrin and Bourdon relative to the plan of his getting a position in Mr. Coakley's office. [The judge ruled that this might be considered as against Mr. Weston; if it was not brought to the knowledge of Holmes it could not be considered as against him.]

"Hayes' testimony that he was promised an increase in salary if he was successful, so that his total salary would be $100 a week. [The judge ruled the same way.]

"Testimony of Hayes that he spent time about the court house, that he knew Sugrue of Mr. Coakley's office, that he got an interview with him and said that he would like a position and referred to his need of work, and that he saw Sugrue again and was then hired to go to work in Mr. Coakley's office at $30 a week.

"Testimony of Hayes as to the conversation which was the main one in the conspiracy indictment, — the conversation fixed by Hayes as soon after November tenth, after he had got a position there, in which he stated to Mr. Weston, Cabot and Bourdon, or some of them, that he had been successful in getting the job and that he insisted upon its being kept secret because he did not want it known that he was working for both Cabot and Coakley, and in the same conversation, his inquiry of Cabot as to what he was to do while there, and Cabot's statement that he was to take his instructions from Mr. Perrin and Mr. Weston, and that he, Cabot,

did not want to be informed too much about the details, and they told the witness that they would not tell anyone except those who should know it, and he was told his salary was to be $100 a week, that he was to keep his eyes and ears open and if anything of importance happened to report it to Mr. Weston or Mr. Perrin, and that he was to report who came into the office, how long they remained, and what he heard, and was to secure any evidence that he could regarding the investigation of Mr. Coakley. [The judge made the same ruling.]

"Testimony of Hayes that Holmes gave Hayes a memorandum slip and said it contained a list of cases they were interested in, and said he would like evidence on those cases. [The judge made the same ruling.]

"In Hayes' testimony, after he had described the conference he had after the disclosure at the meeting of the Bar Association on July 21, after the statement of Mr. Weston that he did not think that the District Attorney would indict, there follows a series of conversations about securing counsel for Hayes and about paying him a thousand dollars at the time of his discharge, all being matters which were offered because of the charge of conspiracy.

"The testimony of Bourdon of his conversation with Cabot, Mr. Weston and Mr. Perrin in Perrin's law office with regard to Hayes getting a job in Coakley's office. [The judge admitted this as against Weston.]

"Testimony of Bourdon that previous to this there had been talk as to Hayes' dissatisfaction with his pay; that the suggestion had been made about having someone in Mr. Coakley's office, that it was made by either Mr. Weston or Mr. Perrin, and Hayes was named as the person to do it; and that Cabot said he would pay Hayes the difference between what he got from Coakley and $100. [The judge admitted this as against Mr. Weston.]

"Testimony of Bourdon that there was a meeting when Hayes announced his success in getting a position and asked what he should do and was told what he should do and to whom he should report, and that Cabot did not want to know too much about the details; that this was at 400 Boylston street, and that it was said that Hayes should keep his eyes and ears open. [The judge ruled that this evidence should stand as against the defendant Weston.]

"Bourdon's testimony that at a meeting with Mr. Weston and

Mr. Perrin, Mr. Weston suggested that Hayes get a job in Mr. Coakley's office; that there was some talk of a possible material increase in Hayes' salary. [The judge ruled that this was admissible as against Mr. Weston.]"

Exceptions were saved by the defendants to so much of the rulings of the judge as affected them respectively.

Other exceptions saved by the defendants are described in the opinion.

The defendants Weston and Holmes were found guilty as charged in the second indictment, and they alleged exceptions.

*E. F. McClennen,* (*M. F. Hall* with him,) for the defendants Weston and Holmes.

*D. M. Lyons,* Assistant District Attorney, for the Commonwealth.

JENNEY, J. The questions involved arose in the trial together of two indictments. The first indictment charged Godfrey L. Cabot, Robert D. Weston, Hector M. Holmes, and Oswin T. Bourdon with conspiracy to steal property of Daniel H. Coakley; at the conclusion of the evidence, a verdict of not guilty was ordered as to the defendants Cabot, Weston and Holmes by reason of a variance. Bourdon had pleaded guilty prior to the trial. Weston, Holmes and Michael J. Hayes were the defendants in the second indictment, which charged the defendant Hayes with larceny in three counts; the defendant Weston, in two counts, with receiving stolen property knowing it to have been stolen; and Holmes, in one count, with the crime alleged to have been committed by Weston. Hayes pleaded guilty, and a verdict of guilty was returned against Weston and Holmes on the counts in which they were defendants.

The exceptions of the defendants Weston and Holmes, hereafter called the defendants, taken at the trial of the second indictment, have been argued by them and are now considered under six general divisions.

1. As to the sufficiency of the evidence to warrant the jury in finding that the property alleged to have been stolen was of such character as to make it the subject of larceny, as to intent with which the property was taken by Hayes and as to the knowledge of the defendants that the property was the subject of larceny or that its taking constituted that crime.

There was little, if any, dispute as to what had taken place. Weston, when the events occurred, was counsel for the Boston Bar Association in proceedings before a special committee of the grievance committee of that association to investigate among other things the conduct of Daniel H. Coakley, an attorney. Cabot, who was the complainant before the committee, employed Hayes as a detective; Hayes at the instigation of Cabot and Weston secured employment by Coakley in his office in October, 1919. While so employed, Hayes took from Coakley's office copies of letters, an unsigned draft of an affidavit, a copy of a draft of a declaration, some letters relating to a divorce case, a photograph, and a copy of an affidavit of George E. Thompson. Hayes testified that he gave all these, except the copy of the affidavit of Thompson, to Weston, and that this copy was given to Holmes. They were not returned to Hayes. Both Weston and Holmes knew that Hayes had taken them from Coakley's office and the circumstances under which they had been taken. When Hayes took the papers, he did not intend to return them to Coakley. He understood that they were taken to be used in an investigation which was then being held before the sub-committee of the bar association.

At a meeting of that committee on July 21, 1920, it appeared that Hayes had handed these articles to Weston and Holmes as hereinbefore set forth. Shortly afterward Weston returned to Coakley the papers. In substance the foregoing is all the evidence relating to the intent with which the papers were taken.

The property claimed to have been stolen is now more fully, although concisely, described. It consisted of copies of letters from Hollis H. Hunnewell to Mabelle Adamson, an unsigned paper in the form of an affidavit, and a draft of a declaration, all of which came into Coakley's possession while he was representing Adamson as her counsel in a claim against Hunnewell, and all of which related to that claim. As a part of a settlement between Adamson and Hunnewell, Coakley agreed to deliver to Hunnewell's attorney any letters which Hunnewell had written to Adamson about which he then knew. There was evidence that these copies were not surrendered because Coakley did not then know of their existence. The other letters and the photograph referred to in the second count of the indictment came into

Coakley's possession while he was attorney for a libellant in a libel for divorce, upon which libel a decree *nisi* had been entered on November 27, 1918, and which decree became absolute six months thereafter. The copy of the affidavit of Thompson related to civil and criminal proceedings in which Thompson had acted as attorney.

Coakley testified that while from an "intrinsic point of view . . . the value of the papers would be a dollar or two, counting the expense of making them," some of the papers were of value to him because they involved his reputation and were of the value that his reputation was worth to him, that they were of value to him while they were in the possession of Mr. Weston for the reasons just above given, and that the market value was hard for him to state. "The market value of the copies of the Hunnewell letters was in the hundreds of thousands of dollars, in my opinion, at that time." He further testified as to the copies of the affidavit and as to the photograph that they were of no value "except the monetary value . . . so that I should say it was a matter of under a dollar," but that they were of value to him.

The charge of theft against Hayes in the first count of the indictment was that he did steal "two sheets of paper being copies of certain letters, . . . one other sheet of paper being an unsigned affidavit of Mabelle Adamson, . . . one other sheet of paper being a copy of a declaration in the case of Mabelle Adamson *v.* Hollis H. Hunnewell, . . . the property of one Daniel H. Coakley." The second count averred that Weston had received the papers which were described in the first count knowing them to have been stolen. The third count was for the larceny of "one letter" and "one photograph," both belonging to Coakley. By the fourth count, Weston was charged with receiving a letter and a photograph the property of Coakley, with knowledge that they had been stolen. The fifth charged Hayes with stealing "one affidavit of one George E. Thompson," the property of Coakley; and the sixth alleged that Holmes had received that affidavit with the knowledge that it had been stolen.

While a thing stolen must be of some value, it need not be an article having any special, appreciable, or market value. At common law written instruments as such were not the subject of larceny, but prosecutions for the theft of the paper on which they

were written frequently took place. Report of Penal Code (Mass.) c. XVII., 8 cl. 4. *Rex* v. *Clark*, Russ. & Ry. 181. *The King* v. *Clarke*, Leach C. C. 1036. *Regina* v. *Perry*, 1 C. & K. 725; 1 Den. C. C. 71. *The Queen* v. *Perry*, 1 Cox C. C. 222. *Rex* v. *Bingley*, 5 C. & P. 602. *Regina* v. *Morris*, 9 C. & P. 349. *Jolly* v. *United States*, 170 U. S. 402, 407. *People* v. *Loomis*, 4 Denio, 380. *State* v. *Campbell*, 103 N. C. 344. See 1 Steph., History of Crim. Law, 284; 3 *Ibid*. 143; 2 Pollock & Maitland, Hist. of Eng. Law, 497. However, where a chose in action constituted a valid obligation, the stealing of which was indictable by statute, it has been held that the "piece of paper" was absorbed in it, and that an indictment for its theft must describe it as such. *Regina* v. *Watts*, 2 Den. C. C. 14. *Regina* v. *Powell*, 2 Den. C. C. 403. *State* v. *Campbell, supra.* See *Commonwealth* v. *Brettun*, 100 Mass. 206. In *Commonwealth* v. *Riggs*, 14 Gray, 376, 378, *Metcalf*, J., said: "It was sufficient for conviction, that the property alleged to be stolen should be shown to be of some value, at least to the owner, if to no one else — things of no value not being the subject of larceny." So a conviction of stealing a paper writing called a discharge from military service of the United States was upheld in a case where there had been no direct evidence of value. *Commonwealth* v. *Lawless*, 103 Mass. 425. See *Commonwealth* v. *Burke*, 12 Allen, 182. And in *Commonwealth* v. *Brettun, supra*, at page 207, *Chapman*, C. J., said: "An indictment is also good which alleges a larceny of a piece of paper, alleging its value, without any further description." In that case, the defendant was convicted of the larceny of "one promissory note of the value of three hundred dollars, and one piece of paper" of the same value, "of the goods and chattels" of one Anthony.

The jury properly could find that the papers alleged to have been stolen were of some value. So far as at variance with this conclusion, *Payne* v. *People*, 6 Johns. 103 is not followed. In considering a wholly different subject, it has been said: "Many papers, having no pecuniary value to others, are of the greatest possible value to the owners and are property of a most important character." *Gouled* v. *United States*, 255 U. S. 298, 310. See also *Baker* v. *Libbie*, 210 Mass. 599; *Commonwealth* v. *Dana*, 2 Met. 329; *Boyd* v. *United States*, 116 U. S. 616.

Although all the counts did not describe the things alleged to

be stolen as sheets of paper, that does not aid the defence. The defendants did not by appropriate action raise any question as to the sufficiency of the description of the articles mentioned in the indictment. If a further description had been necessary, the prosecution would have been compelled to file a statement of the particular nature and ground of the crime charged. G. L. c. 277, § 40. The defendants were not entitled to an acquittal because the theft was alleged to be of a letter or an affidavit instead of sheets of paper which had thereon letters or an affidavit. Such variance did not prejudice them in their defence and was immaterial. G. L. c. 277, § 35. See *Commonwealth* v. *Hall,* 97 Mass. 570; *Commonwealth* v. *Morgan,* 107 Mass. 199; *Commonwealth* v. *Terry,* 114 Mass. 263.

The photograph referred to in the indictment was, or might have been found to be, the subject of larceny.

When the papers and photograph were taken, Hayes did not intend to return them. He intended to and did give them to the defendants to be used in the investigation then pending before the committee of the Bar Association. Hayes testified that Weston read the papers and said that he would keep them if it was all right, and that he also said "Very well, I will take them. He further testified that Weston returned one letter and told him that he might replace it, but that he destroyed it instead of so doing. The copy of an affidavit of Thompson was given by Hayes to Holmes, who had requested Hayes to get evidence from Coakley's files relating to specific cases. Hayes also testified that there was no suggestion by Weston or Holmes that any of the papers taken from Coakley's office were to be returned except the letter that has been referred to. There was also evidence admitted without objection that the defendant Weston, admitting that he still had the papers, refused to return them when before the committee of the Bar Association. In reply to a question by Coakley there propounded, "Did Hayes hand you the papers that he stole from my office?" he answered, "Yes." There was other evidence bearing on this subject which need not be stated and is not now considered.

The jury were instructed: "there cannot be larceny unless the person taking . . . [the property] intends to deprive the owner of . . . [it] permanently." The defendants at the trial strenu-

ously contended that there was no intent to deprive the owner of the property, as it was taken solely for use in the investigation before the committee of the bar association, and they now urge that the evidence summarized was insufficient to warrant a finding that the articles were taken with the intent hereinbefore referred to. This issue rightly was submitted to the jury. The offence charged against the defendants was not theft, but receiving property knowing that it had been stolen by Hayes. *Commonwealth* v. *Leonard*, 140 Mass. 473. Even if the papers and photograph were taken solely for use in the inquiry then pending, that purpose did not require a finding that there was no intent permanently to deprive the owner of their possession as distinguished from a temporary or passing use. The fact that they might be returned after the purposes of a wrongful taking had been accomplished, is not sufficient to clear the skirts of the participants. It could not have been ruled properly as matter of law that, when they were taken by Hayes and received by the defendants, there was no intent permanently to deprive the owner of his property. The evidence justified a finding that the possession of the property was not that of the owner or for a temporary use. There was evidence that Hayes took the property in December, 1919, or January, 1920, and that Coakley did not know that this had happened until July, 1920, in which month the property was returned to him only as a result of something that had happened at a hearing before the committee. It does not lie in the mouth of one who has taken property by stealth or violence, or one who has wrongfully received property with knowledge of such facts, to claim that as matter of law a definite intent to keep it permanently must be proven. Such an intent may be inferred from all the facts. *State* v. *Davis,* 9. Vroom, 176. *State* v. *Ward*, 19 Nev. 297.

It is clear that the intent with which the property has been taken need not be wholly to deprive the owner of it, as where property has been taken for the purpose of inducing the owner to offer a reward and then of returning it and claiming the reward. *Commonwealth* v. *Mason*, 105 Mass. 163. See *Commonwealth* v. *Este*, 140 Mass. 279, 284.

The jury were justified in finding that the defendants knew the circumstances under which the property had been taken; it is no

defence that they thought that their conduct was justifiable. *Commonwealth* v. *Peakes,* 231 Mass. 449.

2. As to the charge that the defendant Holmes received an "affidavit of one George E. Thompson" knowing it to have been stolen.

The paper introduced in support of this accusation was in the form of a copy of an affidavit purporting to have been signed by George E. Thompson. It is contended that the difference between the allegation and the proof is not merely a variance or a misdescription, but that the indictment contained an accurate description of property not in fact received and that the difficulty is not cured by the statutes already considered. Before the passage of St. 1899, c. 409 (now embodied in G. L. c. 277), undoubtedly the variance would have been fatal. See *Fitzgerald* v. *Jordan,* 11 Allen, 128; *Commonwealth* v. *Lavery,* 101 Mass. 207; *Commonwealth* v. *Gavin,* 121 Mass. 54; *Commonwealth* v. *Luscomb,* 130 Mass. 42; *Commonwealth* v. *Howe,* 132 Mass. 250; *Commonwealth* v. *Buckley,* 145 Mass. 181; *Commonwealth* v. *Hayden,* 150 Mass. 332.

The defendants cite statutes of other States, somewhat similar to that here in force, and decisions under them that notwithstanding the terms of these statutes, the common law as to variance is substantially in force. Without attempting to distinguish or discuss these cases, we do not follow them so far as they may be inconsistent with the decision here made.

Our own statute is designed to avoid the possibility of reversible error, not going to the merits of the accusation, where in fact the defendant does not suffer prejudice. Senate Doc. of 1899, No. 234. In aid and explanation of this general provision of the statute, it is provided that where an immaterial misnomer of a third person and immaterial mistakes have been made in the description or the ownership of property, there shall be no acquittal for such reasons. The statute is remedial and should be construed with reasonable liberality and so as to give effect to all its provisions. The defendant is safeguarded by his right to a bill of particulars and the power and obligation of the judge to see that he suffers no actual harm.

In the case at bar the paper writing was well known to the defendant Holmes and no objection was made to its admission

in evidence. No confusion, surprise, or inability to make a proper defence appears. The gist of the accusation was the theft of a paper on which the copy of an affidavit appeared. The question whether that paper had upon it an original instrument or a copy thereof did not go to the substance of the charge and the defendants were not prejudiced in their defence. The offence was correctly set forth in its essential particulars; no substitution of offences was caused. The nature and quality of the act was not changed because of the variance. The effect produced by the instrument described and proved, so far as material to the real issue, was virtually the same. Although there is a clear distinction between a document and a copy thereof, that difference is not always observed in common parlance. It is not uncommon to refer to a printed or written record or document as containing or being a deed, will or affidavit when all that is given therein is a copy. It was not error to refuse to rule that there was such a variance between the allegation and the proof, or such a misdescription of the property as to require a verdict of not guilty on the count now considered.

"The objects of the rule of criminal pleading, which requires property in reference to which an offence is alleged to have been committed to be definitely described in the indictment, are to identify the offence, to give the defendant full notice of the nature of the charge, to inform the court what sentence should be passed if he is convicted, and to prevent his being put in jeopardy again for the same cause." Gray, C. J., in *Commonwealth* v. *Strangford,* 112 Mass. 289, 291, 292. In the case at bar the description of the property was sufficient to answer all these requirements. While too much stress cannot be laid upon the necessity of a reasonable opportunity to know the charge made so that the defendant may be able to meet the evidence presented against him, and so that he may be shielded from a subsequent prosecution for the same offence (*Commonwealth* v. *Phillips,* 16 Pick. 211), the statutory provisions, which have substantially changed the strict rules of the common law as to the effect of a variance where no prejudice has arisen and where the essential elements of the crime have been correctly stated, are constitutional. The defendants' right to a full and particular description of the manner in which the offence has been committed has been preserved by the provision entitling

them to a bill of particulars. *Commonwealth* v. *Jordan,* 207 Mass. 259, and cases cited at page 267. *Commonwealth* v. *Farmer,* 218 Mass. 507. *Commonwealth* v. *Allison,* 227 Mass. 57.

3. As to the closing argument of the assistant district attorney to the jury.

The only controverted issues of fact were whether the papers and photograph were of value and were taken by Hayes and received by the defendants under such circumstances as to make their taking larceny.

The argument, emphasized with iteration and reiteration, that one of the defendants had said that the defendants were going to make a "technical defence," was calculated and apparently intended to create in the minds of the jury the conviction that such a course was unjustified, when in fact it was within the defendants' legal right. *Commonwealth* v. *Coughlin,* 182 Mass. 558. In this connection it was urged that this attitude was "the conduct and the language of a man" who thinks that while the law applies to others it "does not apply to him." The assistant district attorney argued that the making of such defence was "the attitude of men" who cause "disrespect for our laws, our courts, our judges, and [that] one of that type does more to destroy civilization than a thousand uneducated people. 'Make a technical defence.'" The argument bristled with attempts to prejudice the jury against the defendants because of unfounded charges against Mr. Coakley and the district attorney for Suffolk County. This was apart from the real issues in the case. The defendants were charged with wrongful conduct not in issue, as to which there had been no evidence. They were in effect charged with "vicious slander" upon Daniel H. Coakley. With reference to the district attorney, it was urged that "damnable and unjustifiable and vicious and cruel slanders and libels [had been] perpetrated upon him." The defendants inferentially, if not directly, were referred to as "these scoundrels who were denouncing . . . [Coakley] throughout Boston." The charges made before the sub-committee of the bar association, which were not in issue nor in evidence, were thus characterized: "A flimsy charge is made. No evidence to support . . . [it]." While the assistant district attorney at the close of his argument said "If they have got a technical defence give them the benefit of it," this statement was thus accompanied: "I want

to know if the defendant's prophecy is true that they will escape on a technical defence."

No attempt has been made to summarize or characterize other parts of the argument to which objection has been made. No useful purpose would be served by so doing. The parts quoted or described are sufficient to show that the argument described was wholly unjustified and was most prejudicial in character. The case in this respect is well within the authority of *London* v. *Bay State Street Railway*, 231 Mass. 480.

While the argument was in progress, the "defendants' counsel called to the attention of the court that he objected to . . . [it] and inquired of the court whether . . . [it] should be interrupted." The judge said to him that he "need not interrupt in the course of the argument and that the court did not care to have the defendants' counsel interrupt counsel for the Commonwealth . . . and that the court would look out for the defendants' rights, that defendants' counsel need not interrupt counsel for the Commonwealth every time that he thought . . . [he] was making an improper argument or stating things that were improper that the court would not require counsel for the defendants to do that;" and it is expressly stated that these directions of the court to the defendants' counsel "led him not to interrupt in the course of the argument."

The assistant district attorney "was not informed nor aware that counsel for the defendants objected to any part of [his] argument . . . while . . . [it] was being made, nor was he so informed that such objection had been made until many days thereafter" when a motion to set aside the verdicts was heard.

Immediately at the close of the argument and with considerable detail, the defendants' attorney called the attention of the court to the fact that arguments had been made appealing to prejudice, to conditions wholly irrelevant, and to things as to which there had been no evidence and as to which evidence would have been improper. Attention was also directed to the fact that it was not possible to particularize the "detailed words of the argument without referring to the stenographic notes;" the judge said that the defendants were not expected to do this. Thereupon the defendants' counsel stated: "If your Honor please, I have urged those specific things in regard to the argument, and if your Honor

thinks that the case should go [to] the jury in view of their having been said and that they should not be specifically called attention to by you, I should like an exception in each instance."

The contention is made that the defendants did not seasonably or properly object to the argument in behalf of the Commonwealth. This contention is unsound. The attention of the judge was called to the improprieties of the argument while it was in progress and in effect counsel was told not to interrupt it and in consequence of this direction did not do so. The fact that the assistant district attorney did not know that this had taken place does not palliate nor extenuate his conduct. Neither does the failure to interrupt counsel excuse the impropriety; one guilty of such conduct is not as matter of law entitled to an opportunity for immediate retraction; the rule of law as to the necessity of seasonable objection is primarily to enable the judge to take such timely action as may be required, and to allow him to determine whether there shall be an interruption of the argument, or other appropriate proceedings. The objection was seasonably made and was sufficient in the circumstances. While the judge might well have directed a discontinuance of the objectionable line of argument, he was not obliged to pursue this course which, undoubtedly, is ordinarily the wiser one. *Commonwealth* v. *Peoples Express Co.* 201 Mass. 564. *Commonwealth* v. *Richmond,* 207 Mass. 240. It was, however, the duty of the judge, if the trial was to continue, so to deal with the grave impropriety of the argument as adequately to correct any erroneous effect and thus protect the defendants' rights. *Commonwealth* v. *Richmond, supra. Tildsley* v. *Boston Elevated Railway,* 224 Mass. 117.

In the charge to the jury the judge thus treated the impropriety of the argument:

"Now, there is no class, or race, or any other distinction in the court room. Every one is alike, and every one has the same rights who is brought in here to be tried. There is no distinction, no deprivation of rights, and no grant of unusual rights, but they all stand alike. So any consideration of that sort, class, race or any other distinction, you cannot treat them fairly and justly unless you dismiss that entirely from your minds, and I know you will. I emphasize this strongly, and I know you will, if you have not done so already. My own impression is that you probably are

not influenced by any such thing and probably would not have been if I had not spoken of it, but perhaps some of you have not been on a jury before, and it might be advisable for me to call that to your attention. . . .

"Mr. Coakley is not on trial here; he is not before us. The district attorney is not on trial here; he is not before us. What the effect of your verdict upon them may be is not for your consideration. If you should have that in your minds at all here it might result in a mistrial of the case. It has nothing to do with your consideration of the case, as you will see in a few minutes. The question is, Is this offence proved, that is all. If it is, that is sufficient. The effect on the bar association or any other body of persons is not for us to consider here, and I cannot impress this too strongly on your minds. It is only this case that we are trying, this and this alone, and I want you to take it and as we analyze it, gentlemen, I do not think you will have any difficulty in dealing with it. But if we are misled, if we allow ourselves — I do not intimate at all that any one has desired or tried to mislead you — but if we sought to mislead ourselves in a case then we cannot arrive at a just verdict, or a true verdict. We must take the case and try that and try that alone.

"There is no evidence here in this case what the charges were before the Bar Association, no evidence at all before us what the charges about Mr. Pelletier or about Mr. Coakley were, if there were any, and we are not trying those charges, but what we are trying is, Did the defendants do the things charged in this case, that is all. . . .

"Having said all I care to about that my next step will be this: What is this case that we are trying? I do not mean by that to intimate that the counsel have not put it before you, but counsel are partisans. We expect them to be partisans. I have tried cases — a good many years ago — and I know what a tense situation it is for a lawyer to be in when he tries a case. Sometimes the safety valve rises a little, sometimes there is a little excitement — you and I cannot help it — but if you could consider what it means, if you and I could put ourselves in the place of counsel for a few minutes, you would wonder that there is not an explosion in cases, not merely a lifting of the safety valve, but an explosion. I do not know of any situation where so much is demanded in the way of

self-control over persons than counsel in trying a case. We want them zealous. We expect them to be faithful, earnest in their acts and their conduct in reference to the sides of the case that they represent, but we cannot share that feeling, because we decide the cases, and there is no judge so poor, no person is so poor a person to decide a matter as one who is interested, or who is a partisan. What would you think, gentlemen, if counsel in the cases that come in here come in a coarse, lackadaisical way and let poor defendants go. You would say that that poor defendant should have had somebody else to look out for his interests, that his counsel is not taking care of him properly. And so with reference to the district attorney, if he should come in here and say, 'Well, let it go,' carelessly and in a slovenly way, you would say that there should be somebody else in there to look out for the interests of the Commonwealth, for he is representing the interests of the Commonwealth, he is not representing any private persons. It is the interests of the Commonwealth that he is representing, but we expect him to be careful and zealous in doing that, and we expect counsel for the defendant to be the same way.

"I know what this means. Counsel when they are approaching perhaps a very perilous situation on one side or the other, they cannot help being unnecessarily interested so earnest is their zeal, and occasionally outbursts are to be expected, but I always attribute it to the sincere desire of the respective counsel to see that their side of the case is properly defended, and it is a great relief to me, and it must be to you, to know this, that when you have able, faithful, honest counsel in a case you have received all the aid that you can get, they will leave nothing undone toward the representation and the true presentation of their respective sides. Of course, they do not agree. If they did we should have nothing to try. . . .

"The charge is not that any one was disbarred by the bar association. The charge is not that any one has done any wrong to Mr. Pelletier or accused him. The charge is not that any one told or made false accusations against Mr. Coakley."

This treatment of the argument of the assistant district attorney was inadequate. It was the duty of the judge to emphasize the fact that the argument had been grossly improper; to point out in plain, unmistakable language the particulars in which it

was unwarranted and to instruct the jury to cast aside in their deliberations the improper considerations that had been presented to them, using such clear and cogent language as would correct the obviously harmful effect of the argument. This was not done.

It does not follow that the defendants are entitled to a new trial. Up to the end of the charge no error in law had arisen because of the argument. As the judge was not bound to interrupt the assistant district attorney and was not required to declare a mistrial, no exception could have been sustained, if his charge had been adequate. The only mistake of law that existed was in the failure properly to instruct the jury as to the consideration to be given to the arguments. At its close the defendants merely saved "an exception to letting the case go to the jury in view of the prejudicial argument made for the Commonwealth." The general statement made prior to the beginning of the charge was not sufficient to cure this omission. Its language was anticipatory. It was in effect a statement that if the judge thought that the case should go to the jury in view of the argument, and if he decided that the attention of the jury should not be specifically called to the improper argument, an exception would be taken. There was no direct and definite request and present claim of an exception as in *London* v. *Bay State Street Railway, supra,* where counsel said, "I desire to except to, and ask to have the jury instructed to disregard" specified provisions of the argument. As the opinion in that case points out, this request was not given in terms or in equivalent language. In the circumstances of this case and in accordance with the usual rule, the judge was entitled at the end of the charge to have errors and omissions claimed to exist therein brought to his attention, and if an exception was desired because of such omission or error to have the exception taken for such reason or reasons. *Commonwealth* v. *Teregno,* 234 Mass. 56. *Commonwealth* v. *Byce,* 8 Gray, 461. *Boutelle* v. *Dean,* 148 Mass. 89. *Commonwealth* v. *Kaplan,* 238 Mass. 250. As this was not done, there was no error entitling the defendant to a new trial.

4. As to the denial of the defendants' motion for a change of place of trial.

This exception was taken to the action of a justice who heard

the motion, but did not preside at the trial. Any exception to his action could be allowed by him alone, in the circumstances described by the record. Even if there is merit in the exception (see *Crocker* v. *Justices of the Superior Court,* 208 Mass. 162; *Commonwealth* v. *Leventhal,* 236 Mass. 516), which is not intimated, it is not properly before this court. *Brooks* v. *Shaw,* 197 Mass. 376. *Holbrook* v. *Seagrave,* 228 Mass. 26. G. L. c. 231, § 115; c. 278, § 31.

5. As to the failure of the judge to strike out the evidence which was admissible upon the indictment for conspiracy to commit larceny, but which, it is claimed, was not relevant to the issue of receiving stolen property with knowledge that it had been stolen.

After the defendants Cabot, Weston and Holmes had been discharged upon the indictment for conspiracy, the defendants Weston and Holmes requested the judge to strike out the evidence which had been admitted on that indictment and which did not bear upon the remaining one. They specified the general evidence to which the motion related. The judge was not bound to scan minutely the evidence that had been admitted, and properly could overrule the motion if the evidence referred to therein was relevant to the issues on trial in the indictment finally submitted to the jury. Without discussing it in detail, the evidence which was not stricken out or limited by the judge was admissible either as showing the intent with which the papers had been taken or the knowledge of the facts which the defendants had when they were received by them. So far as shown by the record there was no error in the action of the court.

6. As to the verdict of acquittal upon the indictment for conspiracy to commit larceny.

At the close of the evidence upon this indictment, each defendant moved that a verdict of acquittal be ordered, and by direction of the judge a verdict of "not guilty on the ground of a variance" between the evidence and the indictment was returned as to each defendant against whom the case was then pending. The defendants Cabot, Weston and Holmes excepted to this limitation of the verdict.

Unless the rights of these defendants were affected by the limitation, the exceptions must be overruled, and it is not necessary to consider whether the verdict was erroneous. The prac-

tice of directing a jury to return a verdict in the form used in this case has long prevailed. It is recognized by the statute hereinafter quoted. It is a convenient and proper way to place upon record the fact that the judge ruled as a matter of law that the evidence did not support the offence charged. It is immaterial on the question here considered, whether the final order is that the defendant "go without day," or merely that he be "discharged." The judgment entered by the court after the rendition of the verdict does not control. *Commonwealth* v. *Tuck,* 20 Pick. 356, 365. *United States* v. *Ball,* 163 U. S. 662, 667, 671. *Kepner* v. *United States,* 195 U. S. 100, 130, 133, 135, 136. 2 Hale's P. C. 394. Stark. Crim. Pl. (2d ed.) 321. And the inclusion of the reason for the direction of the verdict does not enlarge nor limit the legal effect which it would have had in its absence, in case the acquittal is pleaded in defence to a subsequent indictment. The controlling issue, then, is whether the defendant has been put in jeopardy by the former proceedings. An acquittal is a bar to a subsequent conviction for an offence upon which a defendant properly could have been convicted thereunder because it was embraced in the crime as then charged. *Commonwealth* v. *Roby,* 12 Pick. 496. *Commonwealth* v. *Clair,* 7 Allen, 525. *Wood* v. *Southwick,* 97 Mass. 354, 356. *Commonwealth* v. *Bosworth,* 113 Mass. 200. If the judge against the objection of a defendant wrongfully directs a verdict when there is in fact evidence justifying a conviction of the offence charged or of some crime embraced therein, the erroneous limitation in the verdict will not impair the legal effect of the acquittal in proceedings in which the defendant has in truth been put in jeopardy. *People* v. *Hughes,* 41 Cal. 234. If the evidence did not have the effect described, but would have supported an indictment for a distinct crime, the verdict of acquittal, even though no limitation is expressed therein, could not be pleaded in defence to a subsequent indictment. The question of former jeopardy is not determined by reference alone to the form of verdict, and the inclusion of the reasons for the direction of the verdict does not prevent the defendant from fully availing himself of it as a defence in subsequent criminal proceedings. When a former acquittal is pleaded in bar, two kinds of matters are involved, those of record consisting of the former proceedings and the acquittal, and those of fact which involve the identity of the

offence and of the person alleged to have been guilty. *Commonwealth* v. *Roby, supra. Commonwealth* v. *Merrill,* 8 Allen, 545. 2 Hale's P. C. 241. *People* v. *M'Gowan,* 17 Wend. 386. It is provided by G. L. c. 263, as follows:

"Section 7. A person shall not be held to answer on a second indictment or complaint for a crime of which he has been acquitted upon the facts and merits; but he may plead such acquittal in bar of any subsequent prosecution for the same crime, notwithstanding any defect in the form or substance of the indictment or complaint on which he was acquitted.

"Section 8. If a person has been acquitted by reason of a variance between the indictment or complaint and the proof, or by reason of a defect of form or substance in the indictment or complaint, he may be again arraigned, tried and convicted for the same crime on a new indictment or complaint, notwithstanding such former acquittal."

These provisions were first embodied in Rev. Sts. c. 123, §§ 4, 5, and were "intended to define and determine, as far as may be, the cases in which a former acquittal shall, or shall not, be a bar to a subsequent prosecution for the same offence." Report of Commissioners on Gen. Sts. (1835) Part IV, c. 123, note to §§ 4, 5. See also *United States* v. *Ball, supra,* at page 668. These sections do not change the fundamental principle that a person cannot be twice put in jeopardy for the same offence; but their effect in other respects is not now involved. The action of the judge in this case being in the defendants' favor did not prejudice their legal rights, even if mistaken.

The remaining exceptions have not been argued and are treated as waived. For the reasons already given, the exceptions must be overruled.

*So ordered.*